# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 21, 2016        Decided August 2, 2016

No. 14-7193

SUSAN WEINSTEIN, INDIVIDUALLY AS CO-ADMINISTRATOR OF
THE ESTATE OF IRA WILLIAM WEINSTEIN,
AND AS NATURAL GUARDIAN OF
PLAINTIFF DAVID WEINSTEIN (MINOR), ET AL.,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, ET AL.,
APPELLEES

———

Consolidated with 14-7194, 14-7195, 14-7198,
14-7202, 14-7203, 14-7204

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:00-cv-02601)
(No. 1:02-cv-01811)
(No. 1:08-cv-00520)
(No. 1:01-cv-01655)
(No. 1:08-cv-00502)
(No. 1:00-cv-02602)
(No. 1:14-mc-00648)

———

*Meir Katz* argued the cause for the appellants. *Robert J. Tolchin*, *Steven T. Gebelin* and *Scott M. Lesowitz* were with him on brief. *Jeffrey A. Miller* entered an appearance.

*Noel J. Francisco* argued the cause for the garnishee-appellee Internet Corporation for Assigned Names and Numbers. *Tara Lynn R. Zurawski* and *Ryan J. Watson* were with him on brief.

*Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, United States Department of Justice, *Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Douglas N. Letter*, *Mark R. Freeman* and *Sonia K. McNeil*, Attorneys, were on brief the for *amicus curiae* United States.

Before: GARLAND,[*] *Chief Judge*, HENDERSON, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The plaintiffs—victims of terrorist attacks and their family members—hold substantial unsatisfied money judgments against defendants Islamic Republic of Iran (Iran), Democratic People's Republic of Korea (North Korea) and Syrian Arab Republic (Syria) arising out of claims brought pursuant to the Foreign Sovereign Immunities Act (FSIA). To satisfy the judgments, the plaintiffs sought to attach Internet data managed by the Internet Corporation for Assigned Names and Numbers (ICANN) and, accordingly, served writs of attachment on ICANN. On ICANN's motion, the district court quashed the writs, finding the data

---

[*] Chief Judge Garland was a member of the panel at the time the case was argued but did not participate in this opinion.

unattachable under District of Columbia (D.C.) law. We affirm the district court but on alternative grounds.

## I.     Background

### A. TECHNICAL

This case requires substantial explanation of the sought-after data.[1] The plaintiffs initiated these proceedings by serving multiple writs of attachment on ICANN seeking the country-code top level domain names (ccTLD) and Internet Protocol (IP) addresses of Iran, Syria and North Korea, respectively. Neither the ccTLD nor the IP address lends itself to easy description.

Both data are parts of the Internet, the "network of networks," *Am. Civil Liberties Union v. Reno*, 929 F. Supp. 824, 844 (E.D. Pa. 1996), which is "comprised of numerous interconnected communications and computer networks connecting a wide range of end-users to each other." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 409 (2d Cir.

---

[1] In district court, the parties apparently agreed that the motion to quash should be decided under Federal Rule of Civil Procedure 12(b)(6). *See* Pls.' Mot. for Six Month Discovery at 18 (describing ICANN's motion and its timing as "akin to a defendant filing a Federal Rule 56 summary judgment motion at the very outset of a case"); ICANN's Opp. to Pls'. Mot. for Six Month Discovery at 13 n.3 (responding that "Motion to Quash is functionally identical to a Rule 12(b)(6) motion to dismiss"). We resolve all factual disputes accordingly, "accepting as true all of the factual allegations contained in the [plaintiffs' submissions] and drawing all inferences in favor of" the plaintiffs. *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014) (alterations omitted).

2004).[2]  The IP address is the appropriate starting point. Every device connected to the Internet and every web page on the Internet is identified by an IP address.  The IP address appears as a string of numbers separated by periods, for example, "100.200.123.234." It identifies the location, "*i.e.*, a particular computer-to-network connection" of an end-user's computer and also "serves as the routing address for . . . requests to view a web page." *Id.*  The IP address is critical to the Internet's functioning in the same way a telephone number is essential to the functioning of the telecommunications system.  One may dial a set of numbers to connect to other individuals through the telecommunications system and the same is true vis-à-vis an IP address and the Internet.  Granted, an ordinary Internet end-user does not operate this way.  For example, Google has the IP address "173.194.65.113" but few would maintain that entering that address in an Internet browser is the most practical way to access the Google web page.  Instead, most end-users simply type "google.com" to access the Google web page.

Because the numeric IP address is difficult to remember, the domain name system (DNS) was created to provide a more user-friendly Internet.  At bottom, a "domain name" is the alphanumeric "Web page address[] that end users type into their browsers" and the DNS matches that name (*i.e.*, "google.com") "with the [IP] addresses of the servers containing the Web pages the users wish to access." *Nat'l Cable & Telecommn's Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 (2005).  Thus, much of the DNS's value lies in its ability to enable an end-user, with a domain name in hand,

---

[2] We hereinafter use "end-user" to refer to an individual seeking to access a web page on the Internet through an Internet browser.

to access a desired IP address and, more importantly, its corresponding web page without in fact *using* the IP address. But unlike an IP address, "a domain name does not signal where a computer [or web page] is . . . located. . . . [A] domain name is not an address as typically understood but instead is a mark identifying a specific person's or organization's site on the Internet." *Thomas v. Network Solutions, Inc.*, 176 F.3d 500, 503 n.2 (D.C. Cir. 1999). In order to reach the "site," the user's domain name input must be "translate[d] . . . into [a] numerical IP address," *Register*, 356 F.3d at 410–11 & n.14, *i.e.*, the domain name must be "resolved," *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 577 (2d Cir. 2000).

Understanding the "resolving" process begins with breaking down an Internet web page name—*i.e.* a domain name ("google.com")—into two parts. The first part appears after the last dot—the "top level domain" (TLD). As relevant here, there are two types of TLDs: generic TLDs and country code TLDs (ccTLDs). The former include ".com," ".net" and ".org" whereas the latter are distinguished by a national, geographic or political association—for example, ".us" for the United States and, here, ".ir" for Iran, ".sy" for Syria and ".kp" for North Korea.[3] The second part precedes the last dot—the second level domain (SLD); *i.e.*, "google" in the "google.com" example.

Broadly speaking, an Internet end-user searching for (the technical term is "querying") a domain name like

---

[3] The plaintiffs also sought to attach the defendants' internationalized TLDs—TLDs that appear in a country's language-specific font—*i.e.*, "ایران." for Iran. For simplicity, and because the parties do not treat them differently, we use the term "ccTLDs" to refer to both the conventional and the internationalized ccTLDs.

"google.com" reaches the web page in one of two ways depending on whether he already has visited that web page. In either case, his device ordinarily first sends the query to a nearby DNS "caching server" operated by the end-user's Internet service provider (ISP).[4] *See* Daniel Karrenberg, *The Internet Domain Name System Explained for Non-Experts*, *in* INTERNET GOVERNANCE: A GRAND COLLABORATION 23 (U.N. ICT Task Force 2004). The caching server knows the location of the web page if it has "cached" it, *i.e.*, "remembered it . . . from a previous transaction." *Id.* at 24. In that case the query does not go beyond the caching server because it directs the end-user to the desired location. *Id.* Thus, once an end-user has visited "google.com," his caching server remembers the web page location for subsequent visits. And if the end-user has never visited the requested SLD—*i.e.*, never visited "google.com"—but has visited another ".com" web page (*e.g.*, "amazon.com"), the caching server recognizes the location of the TLD (".com"), asks it for the location of the SLD ("google.com") and then routes the end-user accordingly. *Id.* at 26–27.

An end-user can also locate a web page if he has not yet visited the web page or even its TLD. This way involves a caching server that is empty—it does not know the location of ".com," and even less "google.com," because it has not yet cached them. But the caching server knows at least *one* thing: Pursuant to widely adopted pre-programmed DNS protocols, the server knows to query "a special set of authoritative

---

[4] As its name suggests, an ISP is "an entity that provides access to the Internet." *Register*, 356 F.3d at 410 n.13. Every individual "Web [page], company, university, and government agency that utilizes Internet access . . . subscribes to an ISP or is one." *Id.* at 410 n.13. Commonly-used ISPs include Comcast and Verizon.

servers" otherwise known as "the DNS root servers," *id.* at 27—of which there are thirteen world-wide; namely, one "master root zone server," which contains "the authoritative root zone file,"[5] and "12 duplicate root zone servers," *Name.Space*, 202 F.3d at 577. In short, the caching server knows to go to the top of the DNS's "hierarchical tree structure." *Id.* These thirteen servers—the top of the tree— know the location of all authoritative TLD servers and thus the caching server can locate ".com," ".ir" or any other TLD by querying the DNS root servers. Once one of the root servers tells the caching server the ".com" location, the caching server can query that TLD for all SLDs within it and does not have to revisit the root servers for subsequent web page searches within the ".com" TLD.[6] Thus the root servers form "a critical Internet chokepoint." A. Michael Froomkin, *Wrong Turn in Cyberspace*, 50 Duke L.J. 17, 50 (2000). To use the entire DNS, a caching server need know nothing more than the location of the DNS's thirteen root servers; the root servers, tied to the root zone file, permit any end-user to access all downstream domains.

As relevant here, the DNS's "hierarchical tree structure," *Name.Space*, 202 F.3d at 577, contains three levels—the thirteen root zone servers at the top, TLDs one level below and SLDs one level further below. Each level of the tree "registers" entities one level below. *See* Harold Feld,

---

[5] The root zone file is a file that "contains information on the TLDs within the [DNS] and the location of . . . those TLDs." *Stern*, 73 F. Supp. 3d 46, 49 (D.D.C. 2014). According to the DNS, the thirteen root servers are "authoritative" because they reflect the information contained in the root zone file.

[6] Nevertheless, in reality, a caching server regularly discards its cached information and revisits the root servers to ensure it has current information.

*Structured to Fail: ICANN and the 'Privatization' Experiment*, *in* WHO RULES THE NET?: INTERNET GOVERNANCE AND JURISDICTION 337–38 (Cato Inst. 2003). Thus, a TLD must be registered in the root servers' root zone file in order to be accessible to an end-user. The relationship between SLDs and TLDs is similar. An SLD registers within a TLD; thus, one can access Google only by searching for it in a TLD that it is registered within, *i.e.*, the ".com" TLD. And, just as a particular TLD ensures that no duplicate domain name is registered within (*i.e.*, the ".com" registry allows only one "google.com"), the root zone file ensures that there is only one of each TLD (*i.e.*, only one ".com"). When searched, that is the TLD to which the DNS root server directs an end-user. Because "the vast majority of Internet users," via their ISP, query the root servers when searching for a particular TLD, "[t]he root [zone file] determines which TLDs are visible" to most Internet end-users world-wide. *Wrong Turn in Cyberspace*, 50 DUKE L.J. at 46. Because an end-user cannot use the DNS to locate a particular web page without first accessing its TLD—*i.e.*, an end-user cannot locate "google.com" without first locating ".com"—the root zone file effectively enables an end-user to access most existing Internet web pages. Any TLD not "listed in the root . . . become[s] effectively invisible," *id.* at 47, keeping both that TLD and its registered SLDs beyond the reach of a typical end-user.

With the DNS background established, we turn to ICANN. From shortly after its inception in 1983 until 1998, the root zone file and the DNS were administered by "private hands" under "loose federal supervision." Harold Feld, *Structured to Fail: ICANN and the 'Privatization' Experiment*, *in* WHO RULES THE NET?: INTERNET GOVERNANCE AND JURISDICTION 335 (Cato Inst. 2003). In 1998 the United States government transferred much of its

oversight role to ICANN, a California non-profit corporation. ICANN's mission is to "protect the stability, integrity, interoperability and utility of the DNS on behalf of the global Internet community," Decl. of John O. Jeffrey, App'x 24.2 ¶ 5, and, pursuant to a contract with the United States Department of Commerce (Commerce Department), the organization now performs several functions essential to the functioning of the Internet.

Each TLD requires management. ICANN's first responsibility relevant to this case is its selection and approval of qualified entities to operate each of the Internet's TLDs— "registry operators" in ICANN parlance. Regarding the ccTLDs, ICANN uses a comprehensive procedure for those seeking delegation or re-delegation of registry responsibilities (*i.e.*, ccTLD management). Among other things, a proposed ccTLD manager must (1) possess administrative and technical competency, (2) ordinarily be located in the applicable country or territory, (3) obtain consent from affected parties, (4) manifest its commitment to serve the local Internet community's interest and (5) demonstrate that the appropriate local government does not object to the delegation or re-delegation.[7]

Obtaining ICANN approval for ccTLD management, however, does not automatically effect a registry change. The delegation or re-delegation is effective only if recorded in the root zone file. But ICANN cannot make changes to the root

---

[7] Pursuant to ICANN publications, it is "expected that relevant local governments are consulted" but it is "not a requirement that they consent." *See Common Questions on Delegating and Redelegating Country-Code Top-Level Domains (ccTLDs)*, IANA.ORG, https://www.iana.org/help/cctld-delegation-answers (last visited July 7, 2016).

zone file. Rather, Verisign, another American company, performs the recording function under contract with the Commerce Department. The Commerce Department approves all ICANN ccTLD management delegations and re-delegations and instructs Verisign to implement the corresponding root zone file change. Thus, ICANN screens and recommends, the Commerce Department authorizes and Verisign implements all changes to ccTLD management.[8]

ICANN's second relevant function is the distribution of IP addresses. First, ICANN generates and distributes IP addresses to regional Internet registries (RIRs). There are five RIRS world-wide, each responsible for its own multi-country geographic zone. The RIRs then distribute the IP addresses further downstream; ultimately to end-users and web page operators. Once a website operator obtains an IP address, its web page becomes Internet-accessible. In the usual course, the operator then acquires and links a domain name to the web page in order to use the DNS.

## B. PROCEDURAL

The plaintiffs, victims of terrorist attacks as well as surviving family members of those killed in the attacks, have obtained judgments amounting to hundreds of millions of dollars against the defendant governments for their respective roles in those attacks. *See Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002) ($ 183,248,164 in compensatory and punitive damages); *Haim v. Islamic*

---

[8] *But see* Br. for United States as *Amicus Curiae* at 6 (describing government role as "largely symbolic" in that it is "limited to ensuring that ICANN has followed appropriate processes and avoided technical errors"); *see also id.* ("The policy of the United States is that the Internet's [DNS] should be free from the control of any government, including our own.").

*Republic of Iran*, 425 F. Supp. 2d 56 (D.D.C. 2006) (*Haim I*) ($ 16,000,000 in compensatory damages); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1 (D.D.C. 2011) (*Haim II*) ($ 300,000,000 in punitive damages); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) ($ 259,000,000 in compensatory and punitive damages to Rubin plaintiffs); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012) ($ 338,000,000 in compensatory and punitive damages); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003) ($ 313,000,000 in compensatory and punitive damages); *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010) ($ 378,000,000 in compensatory and punitive damages). For example, in *Weinstein* the plaintiffs, proceeding under the FSIA's "state sponsor of terrorism" exception to immunity from suit, *see* 28 U.S.C. § 1605(a)(7),[9] alleged that Iran sponsored the organization—HAMAS— which detonated a bomb that killed the plaintiffs' kin. A default judgment was awarded pursuant to the state-sponsored terrorism exception and 28 U.S.C. § 1608 ("No judgment by default shall be entered . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."). This suit is the latest—although not the only[10]— attempt to recover on the various judgments.

On June 24, 2014 the plaintiffs served writs of attachment on ICANN seeking the defendants' ccTLDs and

---

[9] This provision has been updated and re-codified at 28 U.S.C. § 1605A, *see infra* nn.21, 22.

[10] *See, e.g.*, *Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993 (2d Cir. 2014) (failed attempt to attach North Korean electronic funds transfers in American banks); *Rubin v. Islamic Republic of Iran*, 709 F.3d 49 (1st Cir. 2013) (failed attempt to attach alleged Iranian antiquities in American museums).

"supporting IP addresses" and subpoenas *duces tecum* seeking information regarding those data. Decl. of Eric P. Enson, Supp. App'x 45–46. ICANN then moved to quash the writs, arguing that (1) the data are not "property" subject to attachment; (2) the defendants do not own the data; (3) the data are not located within D.C. or even the United States; (4) ICANN lacks unilateral authority to transfer/re-delegate the data and (5) the court lacked jurisdiction to issue the writs.[11] After two months of discovery, the plaintiffs sought a six-month extension arguing that ICANN had produced limited information and that further discovery was needed regarding, as relevant here, ICANN's contention that ccTLDs and IP addresses are not "property." In support thereof, the plaintiffs submitted the declaration of one of their counsel who memorialized a discussion he had conducted with an expert on Internet infrastructure and DNS operators. According to the declarant, ICANN "ha[s] a monopoly or complete control over the 'root zone' such that ICANN is wholly and solely responsible for the mapping of [ccTLDs] to their respective registries/name servers." Decl. of Steven T. Gebelin at 3, App'x 51 (Gebelin Decl.). Also according to the declarant, the alleged expert explained that ICANN had in the past "changed and redirected who runs certain ccTLDs . . . in

---

[11] ICANN initially argued that the writs themselves were invalid because they were not court-issued. *See* ICANN's Objections and Verified Answers to Writ of Attachment Interrogatories at 3, Dkt. No. 88 ("ICANN objects to the Writ of Attachment and each and every Interrogatory on the grounds, and in that, they were not properly executed by the Court, as is required by the Foreign Sovereign Immunities Act."). *See* 28 U.S.C. § 1610(c) ("no attachment or execution . . . shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment"). The district court did not address the argument and ICANN has not pursued it on appeal.

conjunction with the 'monetization' of the ccTLDs by their respective governments, including instances where the governments transferred control away from academic communities to government approved third parties that acquired contractual property rights to exploit the ccTLD and generate revenue." *Id.* In short, the alleged expert opined that ccTLDs are property that a sovereign can own and monetize and that ICANN has unbridled authority to redelegate them.

The district court granted ICANN's motion to quash on November 10, 2014. Applying local law pursuant to FED. R. CIV. P. 69(a)(1) ("[P]rocedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."), the court held that ccTLDs are not "goods, chattels [or] credits" within the meaning of D.C. Code § 16-544,[12] *Stern*, 73 F. Supp. 3d at 50–51; accordingly, the court concluded that "there [we]re no factual disputes that require further consideration" and denied as moot the plaintiffs' motion for extended discovery. *Id.* at 51 n.3. On appeal the plaintiffs challenge the district court's interpretation of D.C. law and suggest certification to the D.C. Court of Appeals pursuant to D.C. Code § 11–723(a) ("The District of Columbia Court of Appeals may answer questions of law certified to it by . . . a Court of Appeals of the United States."). They also claim that the district court abused its discretion in denying further discovery. Our jurisdiction is based on 28 U.S.C. § 1291.

---

[12] D.C. Code § 16–544 provides that "[a]n attachment may be levied upon the judgment debtor's goods, chattels, and credits."

14

## II. Analysis

### A. ATTACHMENT IMMUNITY UNDER FSIA § 1609

The FSIA provides "a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state," *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983), as well as the "sole basis for obtaining jurisdiction over a foreign state in our courts," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The statute establishes "two kinds of immunity" for a foreign sovereign. *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2256 (2014). First, as a matter of "subject matter jurisdiction," *Verlinden*, 461 U.S. at 489, the FSIA establishes immunity from *suit* in "the courts of the United States and of the States," 28 U.S.C. § 1604. The seven judgments obtained were awarded pursuant to the state-sponsored terrorism exception to the defendant sovereigns' immunity from suit, 28 U.S.C. § 1605A. *See supra* at 10–11.[13] Second, it establishes immunity from "attachment[,]

---

[13] The judgments in *Haim I*, *Weinstein* and *Stern* were entered under the former state-sponsored terrorism exception, 28 U.S.C. § 1605(a)(7), but those plaintiffs did not convert their judgments to the exception's current version, 28 U.S.C. § 1605A. The plaintiffs concede this point and do not argue for its application to their respective judgments. *See* Appellants' Reply Br. at 23–24 (asserting only *Haim II, Rubin, Wyatt and Calderon-Cardona* judgments were entered or converted under section 1605A); *see also* Appellee's Br. at 50 (*Haim I, Weinstein* and *Stern* "were neither entered nor converted to a judgment under § 1605A."). A judgment entered under former 1605(a)(7) does not—without conversion—trigger section 1610(g). *See infra* at 21–24.

arrest and execution," 28 U.S.C. § 1609.[14]

ICANN contends that, because the plaintiffs did not adequately establish an exception to attachment immunity under the FSIA, 28 U.S.C. §§ 1609–1611, the district court lacked subject matter jurisdiction to "execute against" the defendant sovereigns' property. Appellee's Br. at 39–40. ICANN is mistaken, however, about the jurisdictional nature of attachment immunity. Although the Supreme Court has never expressly addressed whether attachment immunity is jurisdictional, it has in dicta suggested otherwise. *See Akins v. FEC*, 66 F.3d 348, 354 (D.C. Cir. 1995) ("Supreme Court[] dicta . . . not bind[ing]" but "reliance on dicta may nonetheless be reasonable"); *see also ACLU of Ky. v. McCreary Cnty., Ky.*, 607 F.3d 439, 447 (6th Cir. 2010) (inferior court generally "obligated to follow Supreme Court dicta" absent "substantial reason for disregarding it"). In *NML Capital*, the Court referred to the first "kind of immunity" as "jurisdictional immunity" and the latter as both the "immunity defense" and "execution immunity." 134 S. Ct. at 2256. We are without "substantial reason for disregarding" this distinction, *see ACLU of Ky.*, 607 F.3d at 447, and the majority of our sister circuits that have considered the issue are in accord, *see Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("[S]overeign immunity from execution does not defeat a court's jurisdiction"); *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 800 (7th Cir. 2011) (same).[15] We follow suit and

---

[14] 28 U.S.C. § 1609 provides in relevant part that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 . . . ."

[15] One circuit has reached a contrary result, *see FG Hemisphere Assocs. v. Republique du Congo*, 455 F.3d 575, 590–

reject ICANN's challenge to the district court's subject matter jurisdiction.

## B. FEDERAL RULE OF CIVIL PROCEDURE 69(a) AND D.C. CODE § 16–544

Applying the reasoning of the Virginia Supreme Court in *Network Solutions, Inc. v. Umbro Int'l, Inc.*, 259 Va. 759 (2000), the district court observed;

> [t]he ccTLDs exist only as they are made operational by the ccTLD managers that administer the registries of second level domain names within them and by the parties that cause the ccTLDs to be listed on the root zone file. A ccTLD, like a domain name,

---

91 (5th Cir. 2006), but did so relying, in our view, on inapposite precedent. The *FG Hemisphere* court cited a trio of Supreme Court FSIA cases to inform its analysis of section 1609 but they addressed only the Act's immunity from suit provision, 28 U.S.C. § 1604. Granted the Fifth Circuit also cited *Schooner Exchange v. McFaddon*, 11 U.S. 116 (1812), for the proposition that "American courts ha[ve] no *jurisdiction* over" a foreign sovereign's property, *FG Hemisphere*, 455 F.3d at 590 (emphasis added). In *Schooner Exchange* the Court held that certain property of France was "exempt from the jurisdiction of" our courts, *Schooner Exch.*, 11 U.S. at 147, and the case is "generally viewed as the source of our foreign sovereign immunity jurisprudence," *Republic of Austria v. Altmann*, 541 U.S. 677, 688 (2004). It is inapposite here, however, because it involved an attempt to exercise *in rem* jurisdiction despite the plaintiff's not having obtained a valid judgment against France. *Schooner Exch.*, 11 U.S. at 117. FSIA sections 1609–1611—those governing attachment—operate only after the award of a valid judgment. *See* H.R. Rep. 94-1487 at 26 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6625 ("[S]ection 1609 has the effect of precluding attachment as a means for commencing a lawsuit.").

> cannot be conceptualized apart from the services provided by these parties. The Court cannot order plaintiffs' insertion into this arrangement.

*Stern*, 73 F. Supp. 3d at 50 (internal quotations omitted). It then relied on the D.C. Court of Appeals' holding in *Cummings General Tire Co v. Volpe Construction Co.*, 230 A.2d 712, D.C. 1967), to conclude that the ccTLDs "may not be attached in satisfaction of the plaintiffs' judgments because they are not properly subject to attachment under District of Columbia law." *Stern*, 73 F. Supp. 3d at 51.[16] Accordingly, the district court quashed the writs of attachment under local law, interpreting FED. R. CIV. P. 69(a) to require its application. *See Stern*, 73 F. Supp. 3d at 49–50.[17]

Similarly, ICANN uses the Rule 69(a) portal to argue, *inter alia,* that ccTLDs are not "goods, chattels, [or] credits" within the meaning of D.C. Code § 16–544 (permitting attachment "upon the judgment debtor's goods, chattels, and credits") and that local law prohibits attachment both because the data are "inextricably bound up with the provision of services" and because ICANN "cannot transfer them unilaterally or even at Defendants' behest." Appellee's Br. at 14–32. We assume without deciding that local law applies to the determination of the "attachability" of the defendant sovereigns' ccTLDs.[18] In addition, we assume without so

---

[16] As explained *infra* at 26–27, the district court did not address the IP addresses.

[17] The district court denied the plaintiffs' discovery motion as moot. *See id.* at 51 n.3. We affirm for the same reason.

[18] Although we assume the applicability of D.C. Code § 16–544, we nonetheless have reservations about its applicability. Federal Rule of Civil Procedure 69(a)(1) ("The procedure on

execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.") contains significant limiting language. It incorporates only local *procedure*. There are precious few *federal* rules of procedure for execution of judgments; the draftsmen evidently "decided . . . to borrow the format employed in the courts of the forum state," *Resolution Trust Corp. v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993), at least in part to enable a plaintiff to *execute* on a federal judgment, *see, e.g.*, *United States v. Harkins Builders, Inc.*, 45 F.3d 830, 833 (4th Cir. 1995) ("Even though we look to state law to determine the . . . procedure to be followed . . . we do so in furtherance of federal law, giving effect to rules entitling parties to enforce federal judgments in federal courts."); *cf. Peacock v. Thomas*, 516 U.S. 349, 359 (1996) ("[T]he Federal Rules of Civil Procedure provide fast and effective mechanisms for execution" in order "[t]o *protect* and *aid* the collection of a federal judgment." (emphases added)).

In our view, application of Rule 69(a)(1) requires a preliminary determination, *i.e.*, whether D.C. Code § 16–544 is in fact procedural. The answer may depend on an inquiry materially identical to the Supreme Court's so-called reverse-*Erie* precedent holding that the "general and unassailable proposition" that local "rules of procedure govern[] litigation" can be overcome if their application is "outcome-determinative." *Felder v. Casey*, 487 U.S. 131, 138, 141 (1988). The "reverse-*Erie*" title is plainly a nod to the inquiry undertaken when a federal court hearing a *state* law claim must decide whether an issue is "substantive"—and thus determined by state law—or "procedural" and thus subject to the federal rules. *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 428 (1996) (applying *Erie*'s "outcome-determinati[ve] test" with reference to "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws" (internal quotation marks omitted)). Here the proceedings involve a federal, not state, claim. This difference has little significance given Rule 69's broad directive to apply the procedure

holding that local law does not operate to bar attachment of the defendant sovereigns' ccTLDs.[19]

---

"of the state where the court is located." FED. R. CIV. P. 69(a)(1). But if, per reverse-*Erie*, a procedure is inapplicable in state court, it would not "accord with the procedure of the state" for the *federal* court to use that procedure. *Id.*

Granted, in dated cases regarding the scope of "Revised Statutes § 916" (RS 916)—a Rule 69 predecessor, *see United States v. Yazell*, 382 U.S. 341, 355 (1966), the Supreme Court in effect held that the Congress "adopted" all state laws bearing on execution, *Fink v. Oneil*, 106 U.S. 272, 277 (1882). But RS 916 and Rule 69 contain materially different language, making *Fink* inapposite. In addition, modern cases confirm that the *Fink* Court's wholesale adoption of state execution law is, like RS 916, a relic. In *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825 (1988), faced with the assertion that a Georgia "state procedural device for collecting judgments"—garnishment—was in fact "substantive," the Court examined its features before confirming its procedural nature and resulting applicability via Rule 69. *Id.* at 834 n.10 ("under Georgia law, postjudgment garnishment is nothing more than a method to *collect* judgments *otherwise* obtained" (second emphasis in original)).

[19] Assuming, again without deciding, that Rule 69(a)(1) can be interpreted to incorporate a local law attachment bar, execution on a *FSIA* judgment requires caution for another reason. "[A]ctions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States." *Verlinden*, 461 U.S. at 493. Moreover, the conduct of our nation's foreign affairs, if not "vested in the national government exclusively," *United States v Pink*, 315 U.S. 203, 233 (1942), nonetheless restricts "[a]ny concurrent state power . . . to the narrowest of limits," *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941). If a state court's application of a bar on property alienation vis-à-vis a foreign sovereign represents an unconstitutional "intrusion by the State into the field of foreign affairs," *Zschernig v. Miller*, 389 U.S.

## C. FSIA's Exemptions to Execution Immunity

Although attachment immunity is not "jurisdictional," it is nonetheless a "default presumption" that the judgment

429, 430, 432 (1968) (concluding Oregon law providing property of deceased resident escheats if government of nonresident alien heirs prohibited inheritance without interference unconstitutionally intruded on foreign affairs), it can be argued that a federal court's similar application via Rule 69(a) would not "accord with the procedure of the state," FED. R. CIV. P. 69(a), at least, not with a procedure that is—in this arena—constitutional.

The Supreme Court has consistently set aside state laws that materially impede the national government's conduct of foreign affairs, including disposition of foreign assets. In *United States v. Belmont*, the federal government sought to recover property in federal district court from a banker with whom a Russian corporation had deposited funds before the U.S.S.R.'s nationalization of all "property and assets of every kind and wherever situated, including the deposit account" in dispute. 301 U.S. 324, 326 (1937). The United States rested its claim on an "international compact" with the Soviet government wherein the latter "released and assigned to [the United States] . . . the deposit account." *Id.* at 326, 327. The district court held that, because the "bank deposit was within the state of New York . . . in no sense could it be regarded as an intangible property right within the Soviet territory" and thus a "judgment for the United States . . . would be contrary to the controlling public policy of the state of New York." *Id.* at 327. The Supreme Court did not "pause to inquire whether in fact there was any policy of the state of New York to be infringed" because, in foreign affairs, "state lines disappear. . . . [and] the state of New York *does not exist*." *Id.* at 327, 331 (emphasis added). Calling it "inconceivable" for any "[s]tate Constitutions, state laws, and state policies" to "be interposed as an obstacle to the effective operation of" the federal power, the Court reversed. *Id.* at 332; s*ee also Pink*, 315 U.S. at 231–33.

creditor must defeat at the outset. *See Rubin*, 637 F.3d at 800; *see also Peterson*, 627 F.3d at 1125 (execution immunity begins with "presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies"); *see also* 28 U.S.C. § 1609 (defendant sovereign's property "*shall* be immune . . . *except* as provided in sections 1610 and 1611" (emphases added)). In particular, the plaintiffs *now*[20] rely on one or more of three exceptions. The first is the terrorist activity exception, which provides in relevant part that

> [T]he property of a foreign state against which a judgment is entered under section 1605A,[21] and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

[20] ICANN contends that the plaintiffs forfeited or waived reliance on *any* exception to attachment immunity by failing either to raise the issue adequately in district court or to brief it on appeal. *See infra* at 25–26.

[21] Section 1605A is the state-sponsored terrorism exception to a foreign sovereign's general jurisdictional immunity. It abrogates suit immunity if "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such act." 28 U.S.C. § 1605A(a)(1). Courts "shall" hear claims brought under this section if "the foreign state was designated as a state sponsor of terrorism at the time the [aforementioned terrorist act] occurred, or was so designated as a result of such act." *Id.* § 1605A(a)(2)(A).

(A) the level of economic control over the property by the government of the foreign state;

(B) whether the profits of the property go to that government;

(C) the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D) whether that government is the sole beneficiary in interest of the property; or

(E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

28 U.S.C. § 1610(g). The second is the commercial activity exception, which provides in relevant part that

The property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State . . . if the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605(a)(7) (as such section was in effect on January 27, 2008),[22] regardless of whether the property is or was

---

[22] Section 1605(a)(7), as it read on January 27, 2008, is materially identical to current section 1605A.

> involved with the act upon which the claim is
> based.

28 U.S.C. § 1610(a)(7). And the third exception the plaintiffs press to us is section § 201 of the Terrorism Risk Insurance Act (TRIA), which provides in relevant part that

> [I]n every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A of [the FSIA] . . . , the blocked assets of that terrorist party . . . shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610 note.

To preserve an argument on appeal a party must raise it both in district court and before us. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35 (D.C. Cir. 2014) ("[Plaintiff] does not renew [his FSIA exception] argument on appeal, so we do not consider it."). The party must brief the issue with specificity. *See Railway Labor Executives' Ass'n v. U.S. R.R. Retirement Bd.*, 749 F.2d 856, 859 n.6 (D.C. Cir. 1984).

Regarding the terrorist activity exception, the plaintiffs made minimal reference thereto both in district court and in their opening appellate brief. In its motion opposing extended discovery, ICANN argued that "the FSIA divests this Court of subject matter jurisdiction," ICANN's Opp. to Pls.' Mot. for Six-Month Discovery at 8, to which the plaintiffs responded, *inter alia*, that "Section 1610(g) [removes immunity from] property of a foreign state against which judgment is entered

under 1605A," and that "ICANN completely ignores Section 1610(g)." Reply in Supp. of Pls.' Mot. for Discovery 19 & n.13. On appeal the plaintiffs noted that we have "federal question jurisdiction" under "28 U.S.C. § 1610" and included as an addendum the text of section 1610(g). Appellants' Br. at 1, a3.

Ordinarily we might find these "fleeting statement[s]" insufficiently developed to preserve the argument, *see Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008), but the terrorist activity exception is, simply put, different. Once a section 1605A judgment is obtained, section 1610(g) strips execution immunity from *all* property of a defendant sovereign. There is no genuine dispute that four of the plaintiffs' judgments were entered or converted under 1605A.[23] Granted, the plaintiffs must show that the assets in question are "property of" the foreign sovereign, 28 U.S.C. § 1610(g), whether Iran, North Korea or Syria. In our view, there is no additional "argument" that must be preserved. *See Odhiambo*, 764 F.3d at 35. To the extent the plaintiffs must establish that the data at issue are "property" that each defendant has at least *some* ownership interest in, those matters were the subject of additional discovery requests (ultimately deemed moot by the district court) and so it would be premature for us to decide that their attachability is forfeited on that basis. On appeal the plaintiffs included the exception in their opening brief addendum and this was sufficient to put both us and ICANN on notice that they continued to rely on that exception.

---

[23] *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 563 F. Supp. 2d 38, 39 n.3 (D.D.C. 2008) (giving effect to plaintiff's judgment "as if the action had originally been filed under section 1605A(c)."). *Cf. supra* n.13. *Accord Heiser*, 735 F.3d at 937 n.4.

Four of the seven underlying judgments, *Haim II*, 784 F. Supp. 2d 1 (D.D.C. 2011); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) (*Rubin*); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012); *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010), were entered under section 1605A. ICANN, however, argues that "the plaintiffs presented no explanation or evidence" regarding these judgments. Appellee Br. at 49 (quotation marks omitted). We are at a loss to discern what "evidence" the plaintiffs would be required to show under ICANN's approach, particularly given that ICANN does not appear to dispute that four judgments were entered under section 1605A. *Id*. at 50 ("[The terrorist activity exception] is clearly inapplicable to three of the seven underlying judgments at issue here."). Therefore, the plaintiffs have not forfeited reliance on the terrorist activity exception to attachment immunity regarding the *Haim II, Wyatt, Rubin* and *Calderon-Cardona* judgments.

The two remaining exceptions are easily disposed of.[24] There is no reference to the commercial activity exception in the plaintiffs' opening brief notwithstanding ICANN vigorously contested in district court whether the three ccTLDs were "used for a commercial activity in the United States." 28 U.S.C. § 1610(a); *see* ICANN's Mot. to Quash at 18 ("ICANN is aware of no evidence that the [ ] ccTLDs are used for commercial activity of the defendants in the United States."). The plaintiffs rebutted this assertion in district court, *see* Reply in Supp. of Pls.' Mot. for Discovery at 19 ("[T]he Internet Assets at issue are used for commercial

---

[24] The commercial activity exception covers all seven judgments and the TRIA exception applies only to the judgments obtained in *Weinstein, Haim I* and *Stern*.

activity in the United States and the United States is the situs. For example, a .ir second level domain can be purchased in the United States for approximately $100."), but on appeal they failed even to reference their objection in their opening brief. *See* Appellants' Br. at 1–2 ("[I]ssues presented" includes only whether the assets are attachable property under D.C. law, whether the district court erroneously failed to allow additional discovery and whether we should pursue certification to the D.C. Court of Appeals). Their failure to brief the issues in their opening brief amounts to forfeiture. *Odhiambo*, 764 F.3d at 35. Their reliance on the TRIA exception likewise merits no close analysis. Notwithstanding the section 1605A plaintiffs need only to identify "the blocked assets" of the defendant sovereigns under this exception, 28 U.S.C. § 1610 note, they failed to raise the issue in district court.

Finally, we consider the plaintiffs' claim to the IP addresses under all of the three exceptions. The district court did not reach the IP addresses. The plaintiffs contend that its silence amounts to an abuse of discretion but the district court's failure to discuss the IP addresses is easily explained. In their self-styled "preliminary response" to ICANN's motion to quash and their accompanying motion for extended discovery, the plaintiffs only twice referenced the IP addresses—once to claim "ICANN has presented virtually no facts concerning its role in the distribution of IP addresses or the ownership and value of IP addresses" and once to claim that "ICANN's Motion to Quash does not address the economic value of IP addresses." Pls.' Response to ICANN's Mot. to Quash at 7, 9. By contrast, the plaintiffs' same submissions (their preliminary response and their discovery motion) referenced the ccTLDs 78 times, replete with allegations regarding ownership, monetary value and ICANN's administrative role. In light of the plaintiffs'

omission of *any* argument touching on the IP addresses, the district court did not abuse its discretion in omitting to discuss them. On appeal, Amicus United States expressly doubted whether the plaintiffs had "preserved . . . arguments about IP addresses," Br. for United States as *Amicus Curiae* at 19, which assertion the plaintiffs left unrebutted, *see* Br. for Appellants in Response to the United States as *Amicus Curiae*. We consider it waived on appeal. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the *intentional relinquishment or abandonment of a known right.*") (emphasis added and internal quotations omitted).

To sum up, those plaintiffs seeking to attach the underlying judgments in *Haim I*, *Weinstein* and *Stern* have forfeited their claims *in toto*. Those plaintiffs seeking to attach the underlying judgments in *Haim II*, *Rubin*, *Wyatt* and *Calderon-Cardona* have forfeited all but their claim grounded in the terrorist activity exception to attachment immunity.

D. PROTECTION OF THIRD PARTY INTERESTS UNDER SECTION 1610(G)(3)

To this point we have assumed *arguendo* that D.C. law does not impede the plaintiffs' pursuit of the defendant sovereigns' ccTLDs. Moreover, the *Haim II*, *Rubin*, *Wyatt* and *Calderon-Cardona* plaintiffs have not forfeited reliance on the terrorist activity exception to attachment immunity vis-à-vis the ccTLDs. *See* 28 U.S.C. § 1610(g). Ordinarily, remand would be in order to allow the plaintiffs to continue discovery in an effort to establish whether the ccTLDs can properly be considered "property of" the defendants under the FSIA. *See* 28 U.S.C. § 1610(g)(1); *Heiser v. Islamic Republic*

*of Iran*, 735 F.3d 934 (D.C. Cir. 2013). Many critical issues remain disputed.[25]

We assume without deciding that the ccTLDs the plaintiffs seek constitute "property" under the FSIA and, further, that the defendant sovereigns have some attachable ownership interest in them. Nonetheless, pursuant to the terrorist activity exception, the court has the "authority" to "prevent appropriately the impairment of an interest held by a

---

[25] For example, ICANN contends that the defendants do not own the .ir, .kp and .sy ccTLDs and that ICANN is therefore powerless to effect an attachment thereof. As discussed *supra* at. 12–13, the plaintiffs submitted a declaration regarding their counsel's discussion with an "internet infrastructure management and domain name systems operations and development expert" suggesting that ICANN had in the past "changed and redirected who runs certain ccTLDs . . . in conjunction with the 'monetization' of the ccTLDs by their respective governments, including instances where the governments transferred control away from academic communities to government approved third parties that acquired contractual property rights to exploit the ccTLD and generate revenue." Gebelin Decl. at 2–3. There is also record evidence regarding the nation of Tuvalu's monetization of its .TV ccTLD by sale or lease of its ccTLD management rights to a private company for millions of dollars. On the other hand, ICANN contends that ccTLDs are not property at all because they are "not an interest capable of precise definition, because [they are] always in flux," Appellee's Br. at 12, and that "there is, in fact, no established market within which ccTLDs are purchased and sold," *id.* at 13–14. They also argue that no one has the requisite control over ccTLDs in order to establish ownership and that, in any event, "[a]uthoritative Internet protocol standards declare that concerns about rights and ownership of domains are inappropriate." *Id.* at 12. Finally, the United States as amicus argues that the internet governance community "explicitly rejects efforts to assert property rights in [ccTLDs]." Br. for United States as *Amicus Curiae* at 11.

person who is not liable in the action giving rise to a judgment"—*i.e.*, we are expressly authorized to protect the interests of ICANN and other entities. 28 U.S.C. § 1610(g)(3).[26] Because of the enormous third-party interests at stake—and because there is *no* way to execute on the plaintiffs' judgments without impairing those interests—we cannot permit attachment.[27]

The plaintiffs demand, in effect, that ICANN delegate management of the ".ir" ccTLD[28] so that they can "sell or license the operation of the ccTLD[] to a third party." Appellants' Reply Br. at 26. As explained, the power to operate a ccTLD includes the power to register (or remove) domain names from that registry. Thus, an entity seeking a

---

[26] Although the two FSIA exceptions to attachment immunity the plaintiffs have either forfeited or waived do not include a similar provision, this case does not turn on forfeiture/waiver. Only the terrorist activity exception permits attachment "regardless of," *inter alia*, "whether th[e] [defendant] government is the sole beneficiary in interest of the property," 28 U.S.C. § 1610(g)(1)(D). And according to the *expressio unius est exclusio alterius* canon of statutory construction, that the terrorist activity exception expressly provides for attachment of such property suggests that the other exceptions require that the defendant sovereign have a more complete ownership interest. Although we express no view on whether and to what extent the defendant sovereigns, ICANN or any other party can "own" the ccTLDs, it seems plain that satisfying the other exceptions requires a more substantial ownership interest than does this exception.

[27] Moreover, although we do not find it necessary to reach the issue, the United States may be a necessary party hereto and, if so, this fact would provide another reason for quashing the writs of attachment. *Arizona v. California*, 298 U.S. 558, 571–72 (1936).

[28] We use ".ir" (Iran) as an example to illustrate the interests at stake.

".ir" domain name will have to register through the plaintiffs or their designee—a process in which the ccTLD manager can extract a fee. The plaintiffs' plan plainly impairs the interests of "person[s] who [are] not liable in the action giving rise to [the] judgment" in myriad ways. 18 U.S.C. § 1610(g).

First, requiring ICANN to delegate ".ir" to the plaintiffs would bypass ICANN's process for ccTLD delegation, which includes ensuring that the incoming manager has technical competence and a commitment to serving the Iranian Internet community's interests. The plaintiffs and, more importantly, their prospective designee may not possess that technical competence or commitment. Granted, the plaintiffs are "aware that the . . . court can—and should—protect the interests of third parties" and they "welcome the opportunity to work together with the district court and ICANN to ensure a smooth transition." Appellants' Reply Br. at 26. But even if the plaintiffs are able to show adequate competence and commitment, the act of forced delegation *itself* impairs ICANN's interest in "protect[ing] the stability . . . [and] interoperability . . . of the DNS." Decl. of John O. Jeffrey, App'x 24.2 ¶ 5.

Recall that a change in the root zone file will only affect the routing of a search for ".ir." But a change in the root zone file does not also transfer the information stored on the ccTLD server.[29] To ensure that any delegation occurs

---

[29] For example, assume there is now a web page with the domain name "example.ir," meaning that the SLD "example" is registered within the ".ir" ccTLD. An end-user searching for "example.ir" reaches the web page by first querying the root servers for ".ir" and then the ".ir" server for the "example.ir" domain. The ".ir" server directs the end-user to "example.ir" because it knows the location of "example.ir," that is, "example.ir" is registered within it. But, we may also assume, this web page is not currently

seamlessly, ICANN requires that the incoming manager provide a plan to preserve the stability of the ccTLD, which plan explains how existing registrants will be affected. According to ICANN, the current ccTLD managers in the defendant countries will not voluntarily transfer information regarding their registrants and, because the relevant servers are located abroad, we are powerless to so require them. If ICANN is required to direct an end-user looking for ".ir" web pages to the plaintiffs' server but the plaintiffs are unable to direct them to the requested SLD, the Internet's stability and interoperability are undermined.[30]

The impairment does not end there. As the plaintiffs recognize, ICANN occupies its position only because "the global community *allows it* to play that role." Appellants' Br. at 34 (emphasis added). "[T]he operators of . . . top level domains" can "form a competitor to ICANN and agree to refer all DNS traffic to a new root zone directory." *Id.*; *see also* Br. for United States as *Amicus Curiae* at 13 ("As a technological matter, nothing prevents an entity outside the United States from publishing its own root zone file and persuading the operators of the Internet's name servers to treat that version as authoritative instead."). This result,

registered within the *plaintiffs*' server which, post-delegation, would "host" the ".ir" ccTLD. Before the SLD is so registered, an end-user searching for "example.ir" is not able to reach the web page. Although it would remain accessible through the *old* ".ir" server (*i.e.*, Iran's server), the root servers, as a result of the delegation, would no longer direct queries there.

[30] The plaintiffs do not allege that a particular ccTLD management has *ever* been transferred without the cooperation of the outgoing manager. *Cf.* Gebelin Decl. at 6, App'x at 54 (alleging Tuvalu transferred management of its ccTLD to monetize *its* interest).

known as "splitting the root," is widely viewed as a potentially disastrous development; indeed, some regard it as the beginning of "ultimate collapse of Internet stability"—a "doomsday scenario for the globally accessible" network and, thus, for ICANN. Harold Feld, *Structured to Fail: ICANN and the 'Privatization' Experiment*, *in* WHO RULES THE NET?: INTERNET GOVERNANCE AND JURISDICTION 351 (Cato Inst. 2003). Whether that description of a split root is accurate need not concern us; ICANN's interests, as a third party "not liable in the action giving rise to [the] judgment," 18 U.S.C. § 1610(g)(3), are sufficient for us to protect them pursuant to section 1610(g)(3) of the FSIA. *See* Appellee's Br. at 34 ("[F]orced re-delegation of the Subject ccTLDs would . . . wreak havoc on the domain name system."); *see also* Br. for United States as *Amicus Curiae* at 13 ("[T]he result would be devastating for ICANN, for the [current] model of Internet governance, and for the freedom and stability of the Internet as a whole.").

But given that the ICANN-administered DNS is the beneficiary of substantial network effects,[31] how could such a doomsday scenario arise? And why would forced delegation

---

[31] "In markets characterized by network effects, one product or standard tends towards dominance, because the utility that an end-user derives from consumption of the good increases with the number of other agents consuming the good." *United States v. Microsoft Corp*, 253 F.3d 34, 49 (D.C. Cir. 2001) (internal quotations omitted). Here, the ICANN-administered DNS and the authoritative root zone file "tend towards dominance" because domain name registries "and end-users have powerful economic incentives to remain compatible and connected with each other." Milton J. Mueller, *Competing DNS Roots: Creative Destruction or Just Plain Destruction*, 3 J. NETWORK IND. 313, 315 (2002).

hasten its arrival?[32] In light of the plaintiffs' recognition that ICANN's control "stems only from the fact that the global community allows it to play that role," Appellants' Br. at 34, and considering that the delegation of the three defendant sovereigns' ccTLDs could likely antagonize the global community, *see* Br. for United States as *Amicus Curiae* at 13 ("It is not difficult to imagine that a court-ordered change to the authoritative root zone file at the behest of private plaintiffs would prompt members of the global Internet community to turn their backs on ICANN for good."), we believe the doomsday scenario is not beyond imagining.[33]

---

[32] As others have explained, "the deck is stacked so heavily in favor of an established root" that splitting is likely to occur only if "the existing root is doing something seriously wrong." *Competing DNS Roots*, *supra* n.31, at 315.

[33] As noted earlier, an end-user ISP ordinarily uses DNS protocols to ask the root servers for the location of one of the DNS's TLDs. But there is no technological barrier binding ISPs to the DNS. A sovereign has authority over ISPs operating in its country and can "act[] unilaterally to redirect Internet traffic" for end-users within its borders "by requiring Internet service providers . . . to use what amounts to [that] government's own DNS." Harold Feld, *Structured to Fail: ICANN and the 'Privatization' Experiment*, *in* WHO RULES THE NET?: INTERNET GOVERNANCE AND JURISDICTION 354 (Cato Inst. 2003). For example, a foreign government can require that, when receiving a query for a particular TLD, an ISP operating within its borders *not* direct that query to a root server but rather to a different location altogether. If ICANN delegates management of ".ir" to the plaintiffs and the *plaintiffs* control where a query for ".ir" SLDs is directed, Iran has a powerful incentive to require its ISPs to bypass the root servers altogether and instead require ISPs to direct queries to the server that formerly hosted the ".ir" ccTLD. Under that circumstance, end-users in Iran and other parts of the world might access *different* web pages by querying *identical* domain names.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

And there is no reason to suppose that "members of the global Internet community [would not] turn their backs on ICANN for good." Br. for United States as *Amicus Curiae* at 13. For example, another sovereign whose citizens do business through web pages registered under the former ".ir" ccTLD might no longer permit *their* ISPs to search the root servers for ".ir" SLDs. Whether or not this possibility is a positive development for the Internet, it unquestionably impairs ICANN's interests in "protect[ing] the stability . . . [and] interoperability . . . of the DNS," Decl. of John O. Jeffrey, App'x 24.2 ¶ 5.