**UNITED STATES of America,**
**Appellant,**

v.

**Louise MANGO, Kenneth Austin, Kevin Dominske and Phenix Environmental, Inc., Defendants–Appellees.**

**Docket No. 98–1215**

United States Court of Appeals,
Second Circuit.

Argued: Jan. 20, 1999

Decided: Dec. 8, 1999

Jared A. Goldstein, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C. (David C. Shilton, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., Peter D. Coppelman, Acting Assistant Attorney General, Thomas J. Maroney, United States Attorney for the Northern District of New York (Craig A. Benedict, of Counsel), on the brief), for Appellant.

R. Stan Mortenson, Jay L. Alexander, David R. Fontaine, James R. Heavner, Jr., Jody Manier Kris, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, D.C., for Defendants–Appellees Louise Mango and Phenix Environmental, Inc.

Bradford A. Berenson, Sidley & Austin, Washington, D.C. (John N. Gallo and Stephen B. Kinnaird, of Counsel, on the brief), for Defendant–Appellee Kenneth Austin.

Before: LEVAL and POOLER, Circuit Judges, and CURTIN, District Judge.*

POOLER, Circuit Judge:

This appeal requires us to determine whether the Clean Water Act, 33 U.S.C. §§ 1251–1387 ("CWA") allows the Secretary of the Army (the "Secretary") to delegate authority to issue discharge permits to district engineers in the Army Corps of Engineers (the "Corps"). If so, we must also decide the scope of the district engineer's authority to set permit conditions. The United States District Court for the Northern District of New York (Howard G. Munson, *Judge*) found that the Secretary lacked the power to delegate the issuance of permits to anyone other than the Chief of Engineers (the "Chief"). Because a lower level Corps employee issued the permit in question, the district court dismissed all of the indictment counts that charged defendants with violating CWA permit conditions. In the alternative, the court found that permit conditions that were not directly related to the discharge of dredged or fill material were invalid. Based on our holdings that the Secretary properly delegated his permit-issuing authority to district engineers and that permits may include conditions reasonably related to the discharge of dredged or fill material whether the relationship is direct or indirect, we reverse the district court's dismissal of counts two through thirteen and twenty through thirty-one and remand for reconsideration of their viability under the standard set forth in this opinion.

---

* The Honorable John T. Curtin, Senior United States District Judge for the Western District of New York, sitting by designation.

## BACKGROUND

### I. Statutory and Regulatory Framework

With several exceptions, the CWA prohibits the discharge of all pollutants into the nation's waters. *See* 33 U.S.C. § 1311(a). The Administrator of the Environmental Protection Agency ("EPA") bears the major federal responsibility for enforcement and interpretation of the CWA.[1] Thus, although the "Secretary"— defined as "the Secretary of the Army, acting through the Chief of Engineers"— has authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites," 33 U.S.C. § 1344(a), (d), the EPA Administrator can override any individual decision to issue a permit if she finds "that the discharge of such materials ... will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas ..., wildlife, or recreational areas." 33 U.S.C. § 1344(c). The CWA instructs the Administrator, in conjunction with the Secretary, to develop guidelines for issuing permits that include consideration of the effect of disposed pollutants on human health and welfare, marine life, and esthetic, recreational and economic values, as well as various scientific criteria and alternatives to the proposed disposal. *See* 33 U.S.C. § 1344(b) (referencing 33 U.S.C. § 1343(c)). Knowing or negligent violation of a permit condition subjects the violator to criminal liability. *See* 33 U.S.C. § 1319(c).

The Secretary has delegated his CWA permit-issuing authority to "authorized representatives" of the Chief including "district engineers." 33 C.F.R. § 325.8(a), (b). Although permits must contain the name of the district engineer, a lower level employee designated by the district engineer may sign the permit. *See* 33 C.F.R. § 325.8(b). In making permitting decisions, the authorized Corps representative considers criteria contained in 40 C.F.R. Part 230, which was developed by the Administrator, in conjunction with the Secretary, to govern discharge permits issued pursuant to 33 U.S.C. § 1344(b), as well as criteria set out in 33 C.F.R. § 320.4(a), which lists public interest factors the Army must consider in connection with any permit it issues. The Secretary also has defined by regulation certain terms relevant to his jurisdiction. For instance, *"dredged material* means material that is excavated or dredged from waters of the United States," 33 C.F.R. § 323.2(c), and *"fill material* means any material used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a[ ] waterbody," 33 C.F.R. § 323.2(e).

### II. The Iroquois Project

The charges against defendants stem from the construction in 1991 and 1992 of the 370–mile Iroquois pipeline project from Ontario, Canada to Long Island, New York. Defendant Kenneth Austin was the vice president and director of engineering and construction for Iroquois Gas Transmission System Limited Partnership and its agent, the Iroquois Pipeline Operating Co. (collectively, "Iroquois"), which constructed the pipeline. Phenix Environmental, Inc. ("Phenix") performed environmental inspections for Iroquois. Defendant Louise Mango, Phenix' president and principal owner, also acted as Iroquois' manager of environmental affairs. Defendant Kevin Dominske, a Phenix employee, oversaw environmental compliance for Spread Two, a portion of the pipeline project located in northern New York.

Prior to constructing the pipeline, Iroquois had to satisfy several regulatory masters including the Federal Energy Regulatory Commission ("FERC"), which evaluated Iroquois' application to construct

---

**1.** The individual states also play a significant role in implementing and enforcing the CWA. *See, e.g.,* 33 U.S.C. § 1344(g), (h).

the natural gas pipeline. After preparing a final environmental impact statement ("FEIS"), FERC approved the project but required Iroquois to comply with many conditions including those contained in Appendices C and D of the FEIS certificate. *See Iroquois Gas Transmission Sys. L.P.*, 53 FERC ¶ 61,194 (Nov. 14, 1990). Appendix D detailed stream and wetland construction and mitigation procedures, while Appendix C set out an erosion control, revegetation, and maintenance plan for all other disturbed areas.

Iroquois also applied to the Army Corps of Engineers for a discharge permit pursuant to the CWA and the Rivers and Harbors Act, 33 U.S.C. § 403. The Corps identified two areas of the pipeline work as regulated by the CWA: "backfilling of trenches excavated in waterways and wetland areas, and the placement of any temporary fills in waters of the United States necessary to support construction activities." *Record of Decision for Application No. 89–1123–L4 by the Iroquois Gas Transmission System* at 15. The Corps' discharge permit, signed by Lieutenant Colonel Richard C. Boston, acting on behalf of Colonel R.M. Danielson, the Corps' New York District Engineer, required, among other things, that Iroquois implement the environmental mitigation measures contained in Appendices C and D of the FEIS.

### III. The Indictment

An indictment filed in the United States District Court for the Northern District of New York on October 16, 1996, charges that Iroquois, Phenix, the individual defendants, and certain other individuals violated many of the conditions in the Corps' permit.[2] The first count of the indictment charges a conspiracy to defraud the United States and violate the CWA, the mail fraud statute, and the bank false reporting stat-

ute. Counts two through thirty-one allege knowing and negligent violations of the permit conditions.

### IV. District Court Proceedings

After obtaining a bill of particulars, defendants moved to dismiss counts two through thirty-one of the indictment. The district court granted defendants' motion on alternative grounds. *See United States v. Mango*, 997 F.Supp. 264, 299 (N.D.N.Y. 1998). The court first dismissed counts two through thirty-one because the CWA forbids delegation of permit issuing authority to anyone other than the Chief. *See id.* at 281. In a ruling not questioned on appeal, the court alternatively dismissed counts fourteen through nineteen pursuant to the rule of lenity, because the conditions incorporated in those counts were ambiguous. *See id.* at 290–91. The court also indicated that even absent the delegation problem, it would dismiss counts eight through thirteen and twenty-six through thirty-one as well as preclude the government from relying on certain particulars concerning counts two through seven and twenty through twenty-five, because these counts and specifications did not relate to the discharge of dredged or fill materials into the navigable waters of the United States. *See id.* at 298. These counts and particulars derive from Appendices C and D. The district court did not dismiss count one, the conspiracy count, and the government does not appeal from the district court's dismissal of counts fourteen through nineteen.

### V. Scope of Appeal

The government appeals from the dismissal of counts two through thirteen and twenty through thirty-one of the indictment.

---

**2.** Iroquois pleaded guilty to multiple CWA felonies and agreed to pay $22 million in criminal fines. Iroquois also entered into an administrative consent order and civil consent decrees in each of the four federal juris- dictions—including the Northern District of New York—that the pipeline traverses. Iroquois was not named as a defendant in the instant indictment.

## DISCUSSION

The district court correctly assumed the truth of the facts described in the indictment, *see Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952) but dismissed counts two through thirty-one because it found them insufficient as a matter of law. We review the court's conclusions of law *de novo*. *See United States v. Alfonso*, 143 F.3d 772, 775 (2d Cir.1998).

### I. Delegation

■ By regulation, *see* 33 C.F.R. § 325.8(b), the Secretary clearly provided for the delegation of his CWA permitting authority to district engineers and their designees. The district court concluded that this delegation was invalid because the language of 33 U.S.C. § 1344 "unambiguously demonstrates that Congress intended to limit the Secretary's delegation authority to the Chief of Engineers." *Mango*, 997 F.Supp. at 277. As noted previously, the CWA assigns permitting responsibility to the Secretary "acting through the Chief of Engineers." The district court found—and defendants agree—that this wording indicates a congressional intention to preclude any further delegation. Defendants also argue that we must strictly construe the Secretary's ability to delegate the power to set standards of criminal conduct. In response, the government contends that Congress historically has used the phrase "acting through the Chief of Engineers" to assign responsibilities to the Corps rather than to some other branch of the army. Alternatively,

the government urges that the phrase is at best ambiguous, requiring acceptance of the Secretary's reasonable interpretation of the statute as allowing subdelegation.

■ We first consider defendants' argument that because Section 1344 allows the Secretary to set permit conditions and Section 1319 sets criminal penalties for violation of these conditions, we must construe the Secretary's power to subdelegate narrowly. Defendants cite—and we found—no authority directly supporting this proposition.[3] Therefore, we turn to ordinary principles of statutory construction that have been used in both the criminal and civil context.

■ Those principles require that we first determine whether the district court correctly found that the CWA unambiguously precludes delegation to anyone other than the Chief because "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If congressional intent is not clear, we ordinarily will defer to "[a]n agency's construction of a statute it is charged with enforcing . . . if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).[4]

**3.** Although the Supreme Court in *Touby v. United States*, 500 U.S. 160, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) considered whether Congress must provide "more than an intelligible principle" when it "authorizes another Branch to promulgate regulations that contemplate criminal sanctions," the court did not answer the question. *See id.* at 165–66, 111 S.Ct. 1752 (internal quotation marks omitted). The CWA does provide more than an intelligible principle to aid the Secretary or his delegee in setting permit conditions. *See* 33 U.S.C. §§ 1343(c), 1344(b). Therefore, delegation under the CWA would not be sub-

ject to attack even if Congress were required to provide detailed standards for permit conditions.

**4.** Defendants argue that we should not defer to the Secretary's interpretation because the Secretary shares authority to administer the CWA with the EPA Administrator. This argument fails in light of the Supreme Court's deference to the Secretary's interpretation of the CWA in *Riverside Bayview Homes*. *See id.*, 474 U.S. at 131, 106 S.Ct. 455.

Defendants rely, in the main, on two principles of statutory construction to support their claim that Section 1344 unambiguously precludes delegation. First they argue that application of the maxim, *expressio unius est exclusio alterius*, compels the conclusion that by delegating permit-issuing authority to the Secretary "acting through the Chief of Engineers," Congress intended not to allow any other delegation. This maxim is not always a reliable guide because Congress may mention a specific official only to make it clear that this official has a particular power rather than to exclude delegation to other officials. *See Shook v. District of Columbia Financial Responsibility and Management Assistance Auth.*, 132 F.3d 775, 782 (D.C.Cir.1998). Nevertheless, a specific grant of power to an executive official to delegate a function to a named subordinate may be persuasive evidence that Congress did not intend subdelegation to any other official. *See United States v. Giordano*, 416 U.S. 505, 513, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *Shook*, 132 F.3d at 782–83; *Halverson v. Slater*, 129 F.3d 180, 185 (D.C.Cir.1997). For several reasons, the cited cases do not dictate the outcome of this appeal. First, Section 1344(a) does not address delegation directly; instead, it says, "[t]he Secretary may issue permits ... for the discharge of dredged or fill material into the navigable waters." 33 U.S.C. § 1344(a). Section 1344(d) defines Secretary as "the Secretary of the Army, acting through the Chief of Engineers." The statutes construed in *Shook* and *Halverson* addressed much more specifically the question of who had the power to perform the activity in question. *See Shook*, 132 F.3d at 777, 782–83 (interpreting portion of District of Columbia Code that allowed Board of Education "to delegate any of its authority to the Superintendent" not to allow District of Columbia Control Board—the successor by statute to the Board of Education—to delegate

powers to newly created Board of Trustees); *Halverson*, 129 F.3d at 184–85 (interpreting statute that allowed Secretary of Transportation to "delegate the duties and powers conferred by this subtitle ... to any officer, employee, or member of the Coast Guard, and ... provide for the subdelegation of those duties and powers" to preclude delegation to a non-Coast Guard official in light of statutory purposes). Moreover, the Secretary of the Army has not—as did the Secretary of Transportation in *Halverson* and the District of Columbia Control Board in *Shook* —attempted to delegate his powers to an outside agency; instead he delegated within his own branch of the armed services. This distinction is important. *See Shook*, 132 F.3d at 783–84 (indicating that subdelegation within an agency presented a closer question than external subdelegation).

The language that the Court construed in *Giordano* is closer to the language of the CWA. In *Giordano*, the Court considered 18 U.S.C. § 2516 which provided that "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for ... an order authorizing a [wiretap]." *Id.*, 416 U.S. at 538, 94 S.Ct. 1820. The Court held that this language—viewed in the light of (1) Congress' intent to prohibit all wiretaps except those authorized under stringent conditions and (2) legislative history indicating that Congress had considered and rejected a provision allowing subdelegation—required the conclusion that Congress intended to preclude delegation to anyone other than an Assistant Attorney General. *See id.* at 514–20, 94 S.Ct. 1820. Although Section 1344 contains language somewhat similar to the wiretap statute, no legislative history suggests that Congress considered and rejected subdelegation.[5] Therefore, the *Giordano* holding also is distinguishable.

5. Similarly, the legislative history of the statute addressed in *Cudahy Packing Co. v. Holland*, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895

(1942), indicated that Congress considered and rejected provisions that would have granted greater delegation authority. *See id.*

Because (1) the CWA does not address delegation authority specifically; (2) the question in this case is one of internal rather than external subdelegation; (3) there is no legislative history indicating that Congress considered but rejected subdelegation; and (4) the overall intent of the CWA is consistent with authority to subdelegate, we conclude that the use of the phrase "acting through the Chief of Engineers" does not clearly indicate an intent to prohibit subdelegation.

Defendants also argue that Congress' specific authorization of subdelegation by the Secretary in other contexts indicates that Congress did not authorize subdelegation here. However, the statute on which defendants rely, 16 U.S.C. § 460d, is not part of the CWA. Although specific authority to subdelegate one power within a given piece of legislation may indicate that Congress did not intend to allow subdelegation of other powers, *see, e.g., Cudahy Packing,* 315 U.S. at 364, 62 S.Ct. 651, we do not read specific allowance of subdelegation in a different act as a strong indicator of legislative intent in the CWA.

Having found that neither of defendants' statutory interpretation arguments supports its contention that the CWA unambiguously precludes delegation, we must determine whether the Secretary reasonably interpreted the statute to allow subdelegation. "[A]cting through the Chief of Engineers" can be read either to identify the official through whom the Secretary must act or to identify the branch of the Army that will perform the permit-issuing function. Moreover, in 1970—two years before the enactment of the CWA—Congress passed a statute that authorized the Secretary "acting through the Chief of Engineers . . . to construct, operate, and maintain . . . contained spoil disposal facilities." 33 U.S.C. § 1293a(a). Four years after enactment of the CWA, Congress authorized the Secretary "acting through the Chief of Engineers . . . to place on the beaches of such State beach-quality sand."

at 366, 62 S.Ct. 651. Thus, defendants' reli-

33 U.S.C. § 426j. Clearly, Congress did not intend the Chief, a lieutenant general, personally to maintain spoil disposal facilities or to spread sand on the beaches. Thus, the use of "acting through the Chief of Engineers" in these statutes supports the Secretary's argument that Congress merely intended to assign the permit-issuing function to the Corps. Although defendants point to other statutes in which Congress used the same phrase but probably intended to require the Chief himself to act, this inconsistency proves only that the use of the phrase "acting through the Chief of Engineers" is not a reliable guide to congressional intent on subdelegation. Because the statutory language is ambiguous, we must decide whether the Secretary's interpretation is reasonable. If it is, we must accept it.

We conclude that the Secretary's interpretation is reasonable for several reasons. First, Congress has used the same language in other statutes that contemplate responsibility for a duty at a level below the Chief's. Second, the magnitude of the task of issuing permits suggests that Congress intended to allow subordinate Corps officials to issue permits and specify permit conditions. *See Fleming v. Mohawk Wrecking & Lumber Co.,* 331 U.S. 111, 122, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947). We found in 1988 that the Corps processes approximately 11,000 permit applications per year. *See Bersani v. United States Environmental Protection Agency,* 850 F.2d 36, 40 (2d Cir.1988). Defendants argue, however, that when Congress enacted the CWA, the Corps had no jurisdiction over wetlands, making the 1985 figures too high. In defendants' view, the 1976 figure of 1,118 permits is more relevant. *See* H.R.Rep. No. 95–139, 95th Cong., 1st Sess. at 1253 (1977). Even if the relevant number is 1,100 rather·than 11,000, the magnitude of the task is such that it is reasonable to assume Congress did not contemplate it would be performed by one person. Moreover, as with most govern-

ance on *Cudahy* also is misplaced.

ment programs, Congress reasonably could have assumed substantial growth. Finally, the Secretary's interpretation is longstanding, and Congress has not acted to correct it. *Cf. CFTC v. Schor,* 478 U.S. 833, 846, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) ("[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." (Internal citations omitted)). Under these circumstances, we find the Secretary reasonably interpreted Section 1344 to permit subdelegation of permit-issuing authority to district engineers and their designees.

## II. The Permit Conditions

In addition to maintaining that the Secretary impermissibly delegated his permit-issuing authority to district engineers, the defendants, in district court, also attacked the permit's incorporation, via Special Condition 10, of conditions from the FEIS, arguing that (1) Special Condition 10 does not require that defendants precisely carry out each of the permit conditions; (2) the Secretary has jurisdiction to impose only those conditions that directly relate to the discharge of dredged or fill material into the navigable waters of the United States, and most of the FEIS conditions do not satisfy this test; and (3) because the district engineer lacked power to condition Iroquois' permit on *some* of the FEIS conditions, he lacked power to incorporate *any* of them.

The district court held that Special Condition 10, which states that Iroquois "shall implement" the conditions contained in Appendices C and D to the FEIS, clearly incorporated the FEIS conditions into the permit and required that defendants comply with those conditions. *See Mango,* 997

F.Supp. at 291–92. The court also rejected defendants' all-or-nothing approach to the conditions. *See id.* at 292. However, the court accepted defendants' argument that most of the FEIS conditions went beyond the Corps' regulatory authority and therefore were invalid. *See id.* at 296–99. Holding that the Corps could impose only permit conditions that "directly relate" to the discharge of dredged or fill material into the navigable waters of the United States, the court dismissed counts eight through thirteen and twenty-six through thirty-one of the indictment and precluded the government from relying on any of the permit conditions in proving counts twenty through twenty-five [6] and from relying on all but five of the FEIS conditions to prove counts two through seven. *See id.* at 299.

The district court's decision allows the government to prove violations of permit provisions regulating perennial stream crossing procedures, FEIS Appendix D, I(D)(6)-(8); mandating the use of certain construction equipment where standing water or saturated soils were present; and forbidding the use of dirt, rockfill, tree stumps, or brush riprap to stabilize the right of way in wetland areas, D, II(C)(10), (11). *See id.* However, the government cannot rely on violations of any of the *other permit conditions* including requirements that the defendants "[i]nstall and maintain sediment filter devices at [the] edge of all wetlands" until the right of way revegetation was complete, FEIS Appendix D, II(D)(2); "not store hazardous materials, chemicals, fuels, and lubricating oils; refuel construction equipment; or perform concrete coating activities, within 100 feet of streambanks or within any municipal watershed area," *id.,* I(A)(3); and place trench spoil "at least 10 feet away from streambanks," *id.,* I(B)(1).

---

**6.** This disposition allowed the government to prove these counts by establishing that defendants violated Special Condition 13 of the permit which required defendants to "remove in their entirety, any cofferdams, dewatering devices, log roads or other temporary structures or fills placed within the waters of the United States to facilitate pipeline installation, immediately upon cessation of the construction activity in that particular area."

■ The statute authorizes the Secretary to "issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Because the Secretary's jurisdiction is limited to the issuing of permits for such discharges, we agree with the district court that any conditions imposed in a permit must themselves be related to the discharge. Nevertheless, we reach a different conclusion from the district court regarding the nature of the relationship that is required.

The CWA does not itself specify how closely the conditions must relate to the discharge. We therefore begin with the familiar premise that where the statute does not expressly speak to an issue, we will defer to the interpretation of the agency charged with enforcing the statute, provided it is reasonable and not in conflict with the expressed intent of Congress. *See Riverside Bayview Homes*, 474 U.S. at 131, 106 S.Ct. 455. Here deference is due to the reasonable interpretations of the Secretary and the Administrator as contained in the regulations they promulgated jointly, pursuant to 33 U.S.C. § 1344(b). These regulations indicate that permit conditions can be indirectly or directly related to the discharge as long as they are reasonably related to it. *See, e.g.*, 40 C.F.R. § 230.1(c) (providing that the Secretary must consider whether the discharge will "have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern"); 230.76(d) (suggesting minimizing the adverse impact of a discharge by "[f]ollowing discharge procedures which avoid or minimize the disturbance of aesthetic features of an aquatic site or ecosystem"); and 230.74(b) (suggesting "[e]mploying appropriate maintenance and operation on

equipment or machinery ...") Moreover, the regulations reasonably interpret the statutory mandate that the Secretary consider the effect of discharges "on human health or welfare," "ecosystem diversity," and "esthetic, recreation and economic values," 33 U.S.C. § 1343(c)(1)(A), (B), (C) (as referred to in 33 U.S.C. § 1344(b)), and imply that the district court's requirement that permit conditions be directly related to a discharge is unduly restrictive. In our view, permit conditions are valid if they are reasonably related to the discharge, whether directly or indirectly.[7] The CWA is reasonably interpreted to allow the Secretary to consider the cumulative effect of a discharge on an entire ecosystem rather than confining him to consideration of the effects of the permitted discharge on the river into which it is discharged. Like the district court, we are hampered by the government's refusal to explain specifically why each of the permit conditions is related to the permitted discharges. *See Mango*, 997 F.Supp. at 297. On the record as it stands, we cannot determine with certainty which of the conditions adopted from the FEIS are reasonably related to the discharge and which, if any, are not. Therefore, we remand to the district court for consideration of the permit conditions under the standard announced herein.

Because we have not yet found any of the permit conditions to be invalid, it is not necessary to consider defendants' argument that if any of the conditions are invalid, they all must fall. However, defendants cite no authority for this argument, and we have found none.

Defendants' final argument is that all of the counts that are dependent on the conditions in Appendix C to the FEIS, which apply to "uncultivated and non-wetland areas and residential turfs disturbed by con-

7. We reject the government's broader argument that its public interest regulations allow it to set conditions related to the entire activity involving the discharge. When properly read, the public interest regulations do not indicate an intent to regulate the entire activity rather than the permitted discharge. Although the regulation refers to the "proposed activity," the activity that the Secretary permits pursuant to Section 1344 *is* the discharge. Therefore, the conditions must be related to the discharge itself.

struction," and certain portions of Appendix D regulating non-wetland areas are beyond the Corps' jurisdiction, which is limited to the "waters of the United States." 33 C.F.R. § 328.1. Insofar as the conditions imposed are not reasonably related to a discharge into the waters of the United States, defendants are correct. However, if a condition requiring the defendants to take measures on dry land reasonably relates to a discharge into the navigable waters, it is valid.

## CONCLUSION

For the reasons discussed, the judgment of the district court is reversed as to counts two through thirteen and twenty through thirty-one and remanded for further action in accordance with this opinion.