# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 9, 2020          Decided April 16, 2021

No. 19-5285

STAND UP FOR CALIFORNIA!, ET AL.,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00058)

———

*Jennifer A. MacLean* argued the cause for appellants. With her on the briefs was *Benjamin S. Sharp*.

*Brian C. Toth*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, *Eric Grant*, Deputy Assistant Attorney General, and *Mary Gabrielle Sprague*, Attorney.

*Jessica L. Ellsworth* argued the cause for appellee Wilton Rancheria, California. With her on the brief was *Benjamin A. Field*. *Neal K. Katyal* entered an appearance.

Before: GARLAND[*], PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: This appeal comes after a seven-year effort by the Department of the Interior ("Department") to acquire land in trust on behalf of the Wilton Rancheria ("Wilton" or "Tribe") to build a casino. After the Department finalized the acquisition of a parcel of land in Elk Grove, California, Stand Up for California! ("Stand Up"), Patty Johnson, Joe Teixeira, and Lynn Wheat (collectively "Appellants") sued the Department. They brought a litany of claims, including claims that the Department (1) impermissibly delegated the authority to make a final agency action to acquire the land to an official who could not wield this authority, (2) was barred from acquiring land in trust on behalf of Wilton's members, and (3) failed to adhere to its National Environmental Protection Act obligations when it selected the Elk Grove location. Appellants and the Department cross-moved for summary judgment, and the District Court granted the Department's motions on all counts. For the reasons set forth below, we affirm the District Court.

## I.

The Wilton Rancheria is an Indian tribe based in the Sacramento area.[1] Wilton's members are descendants of

---

[*] Judge Garland was a member of the panel at the time this case was submitted but did not participate in the final disposition of the case.

[1] A rancheria is a small Indian settlement in California. *See Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1179 (D.C. Cir. 2018); William Wood, *The Trajectory of Indian Country in California: Rancherías, Villages, Pueblos, Missions, Ranchos,*

Miwok and Niensen speakers. As with its general policy regarding tribal sovereignty, the federal government's approach to Wilton has gone through "drastic fits and starts," vacillating "between coercing assimilation and encouraging tribal self-government." Philip P. Frickey, *Congressional Intent, Practical Reasoning, and the Dynamic Nature of Federal Indian Law*, 78 CALIF. L. REV. 1137, 1138 (1990). Wilton was first federally recognized in 1927, when Congress initiated a program that provided land to Indians who were not on reservations. After Congress passed the Indian Reorganization Act in 1934, Wilton adopted a constitution.

In 1958, however, Congress disestablished Wilton and forty other reservations through the California Rancheria Act ("Rancheria Act"). Pub. L. No. 85–671, 72 Stat. 619 (1958). The Rancheria Act directed the Secretary of the Interior ("Secretary") to dissolve the trusts in which the Secretary held land for forty-one rancherias and tribes, including Wilton, and to distribute the assets. The Secretary was directed to consult with the affected tribes and prepare a plan to distribute the assets or to sell the assets and distribute the profits to the affected tribes' members. Pursuant to this mandate, the Secretary terminated the government-to-government relationship with Wilton and began consultations with the Tribe's members to transfer federal land trust ownership to individual fee ownership. In 1959, the Department approved a distribution plan that would terminate the federal trusteeship of the Tribe, distribute the assets to the Tribe's members, and revoke the Tribe's constitution and bylaws. Once the Tribe's assets had been distributed, the distribution agreement stipulated that the Tribe's members were no longer entitled to the federal government's services because of their status as Indians. In 1964, the Department announced in the *Federal*

---

*Reservations, Colonies, and Rancherias*, 44 TULSA L. REV. 317, 319 (2008).

*Register* that the Wilton Tribe's members were no longer entitled to services reserved for Indians. *Termination of Federal Supervision*, 29 Fed. Reg. 13,146 (Sept. 15, 1964).

In 1979, members of several California rancherias, including Wilton members, brought a class action against the Department for unlawfully terminating the federal government's trust relationship with their tribes. Four years later, the government settled and "agree[d] to 'restore[] and confirm[]' Indian status for some who had lost it" pursuant to the Rancheria Act, including seventeen tribes that had lost their tribal status under the Act. *Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1184 (D.C. Cir. 2017) (quoting Stipulation for Entry of Judgment, *Hardwick*, No. C-79-1710-SW, ¶¶ 2–4 (Aug. 3, 1983)). But Wilton was excluded from the settlement agreement because the district court mistakenly concluded that "[n]o class member from [Wilton] currently owns property within the original rancheria boundaries." *Wilton Miwok Rancheria v. Salazar*, 2010 WL 693420, at *2 (N.D. Cal. Feb. 23, 2010) (quoting Certificate of Counsel re Hearing on Approval of Settlement of Class Actions, *Hardwick*, No. C-79-1710-SW (Nov. 16, 1983)).

Almost forty years later, members of the Tribe sued the Department, seeking federal recognition of the Wilton Rancheria and the acquisition of certain land into trust by the government on the Tribe's behalf. *Id.* at *3. Two years later, the Tribe and the government entered into a settlement agreement. The Department acknowledged that "the United States failed to comply with the Rancheria Act in terminating the Wilton Rancheria and distributing its assets." *Id.* The Department thus recognized that the Tribe was not lawfully terminated. The Department also agreed to restore federal recognition of the Tribe and to "accept in trust certain lands formerly belonging to" Wilton. *Id.* at *3. In June 2009, the district court in California entered the settlement agreement as

a stipulated judgment. After the case settled, the Department published notice of the restoration of Wilton's status as a federally recognized tribe. Since then, the Wilton Rancheria has been listed on the Department's annual list of federally recognized tribes.

In 2013, Wilton petitioned the Department to acquire land in trust on the Tribe's behalf so that it could build a casino. The Tribe proposed a 282-acre plot near Galt, California. Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347, the Department began the process to assess the environmental effect a casino would have. After soliciting public comment, the Department published a scoping report for its environmental impact statement ("EIS"). The scoping report identified seven alternatives for the land acquisition, including a 30-acre parcel in Elk Grove and the Galt site, which the report described as Wilton's "proposed action," *see* 40 C.F.R. § 1502.14; 43 C.F.R. § 46.30, but it did not identify a preferred alternative. *See* 43 C.F.R. § 46.420(d) (defining the "preferred alternative" as the alternative that the agency "believes would best accomplish the purpose and need of the proposed action while fulfilling its statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors"). Two years later, the Department published the draft EIS, where it considered the alternatives in detail. It then held a public hearing on the draft EIS. At the hearing, multiple parties—including one of the plaintiffs in this litigation—spoke in favor of the Elk Grove location. Following the hearing, Wilton changed its preference and submitted a request that the Department acquire the Elk Grove location rather than the Galt location.

In November 2016, the Department requested comment from interested parties about a potential casino in the Elk Grove location. The list of notified parties included the State of California, the City of Elk Grove, and Stand Up. Stand Up

responded that transferring title to the Elk Grove location would moot multiple pending state-court challenges seeking to prevent the acquisition and urged the Department to delay title transfer. The Department denied Stand Up's request. The Department then published its final EIS, which identified the Elk Grove location as the preferred alternative.

On January 19, 2017, the Department issued a Record of Decision ("ROD") that constituted the final agency action to acquire the Elk Grove location in trust on Wilton's behalf. Lawrence Roberts—the Principal Deputy Assistant Secretary–Indian Affairs—signed the ROD pursuant to delegated authority. Roberts had served as Acting Assistant Secretary–Indian Affairs ("AS–IA"), but after his acting status lapsed pursuant to the Federal Vacancies Reform Act ("FVRA"), Roberts continued to exercise the non-exclusive functions and duties of the AS–IA. The same day Roberts issued the ROD, then-Deputy Secretary Michael Connor had issued a memorandum ("Connor Memorandum") that sought to clarify that Roberts was exercising non-exclusive functions and duties of the AS–IA. On February 10, the Department acquired title to the Elk Grove location. Michael Black, who had assumed the role of Acting AS–IA in the new presidential administration, signed off on this acquisition after denying Stand Up's administrative appeal for a stay pending judicial review.

Appellants brought this lawsuit prior to the issuance of the Department's ROD and sought a temporary restraining order, which the District Court denied. Appellants' lawsuit alleged, *inter alia*, that (1) the FVRA and Department regulations precluded the Principal Deputy from exercising the authority to sign off on the ROD acquiring the Elk Grove land in trust; (2) Principal Deputy Roberts was acting without authority when he acquired the title in trust for the Tribe; (3) the Department could not acquire land in trust on behalf of

Wilton's members pursuant to the Rancheria Act; and (4) the Department violated NEPA and the APA by failing to prepare a supplemental or new EIS after it selected the Elk Grove location as its preferred alternative. Wilton intervened on behalf of the Department. After the parties cross-moved for summary judgment, the District Court granted the Department's summary judgment motions. This appeal followed.

We review the District Court's grant of summary judgment *de novo*. *W. Surety Co. v. U.S. Eng'g Constr., LLC*, 955 F.3d 100, 104 (D.C. Cir. 2020). We "evaluat[e] the administrative record directly and invalidat[e] the Department's actions only if, based on that record, they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Stand Up!*, 879 F.3d at 1181 (internal quotation omitted).

## II.

We begin with Appellants' challenge to the Department's redelegation of final decision-making authority to the Principal Deputy. First, Appellants claim that the regulation in question prohibits redelegation beyond the AS–IA. Second, Appellants argue that even if the regulation permitted redelegation, the Department failed to properly redelegate this power to Principal Deputy Roberts.

We reject both of Appellants' challenges. First, the text, structure, and purpose of the regulation confirm that the Department has the power to redelegate final decision-making authority. Second, the Department properly redelegated the final decision-making authority to Principal Deputy Roberts. We therefore affirm the District Court's grant of summary judgment to the government on these claims.

**A.**

The Bureau of Indian Affairs ("BIA") has promulgated regulations governing who can make land acquisitions on behalf of Indian tribes. The regulations define "Secretary" as "the Secretary of the Interior or authorized representative." 25 C.F.R. § 151.2. The Secretary must review each request for the acquisition of land. 25 C.F.R. § 151.12(a). Section 151.12(c) states that "[a] decision made by the Secretary, or the [AS–IA] pursuant to delegated authority, is a final agency action." 25 C.F.R. § 151.12(c). In contrast, Section 151.12(d) provides that "[a] decision made by a [BIA] official pursuant to delegated authority is not a final agency action of the Department . . . until administrative remedies are exhausted." *Id.* § 151.12(d).

To determine whether redelegation of final decision-making authority is permissible, we must first assess whether the power is an exclusive function or duty of the Secretary or the AS–IA. The FVRA forecloses the delegation of exclusive duties and authorities to a successor official after expiration of the statutorily authorized 210-day period of acting-capacity service. The FVRA also establishes that a function or duty is exclusive when it is either "established by statute, and . . . required by statute to be performed by the applicable officer (and only that officer)" or when it "is established by regulation and . . . is required by such regulation to be performed by the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2)(A)–(B).[2] If Congress wants to make clear that a

---

[2] Although Appellants have not raised their FVRA claims on appeal, the statute still provides guideposts to which we should adhere in analyzing the challenge to delegated authority. *Cf. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("[C]onstruction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the

function or duty is exclusive, it may do so through clear statutory mandates. *See, e.g.*, 25 U.S.C. § 3407(a) ("The Secretary shall have *exclusive authority* to approve or disapprove a plan submitted by an Indian tribe . . . ." (emphasis added)). Alternatively, as the Supreme Court recognized in *United States v. Giordano*, a statute may foreclose redelegation when its text, "fairly read" in light of the statutory purpose, evinces a congressional desire to render a function or duty exclusive and non-redelegable. 416 U.S. 505, 514 (1974). Should Congress remain silent on the issue, however, the FVRA provides the Executive Branch with leeway to set out which functions or duties are exclusive and which are not. *See* 5 U.S.C. § 3348(a)(2)(A)–(B); *see also* FEDERAL VACANCIES REFORM ACT OF 1998, S. Rep. No. 105–250, at 31 ("We must be clear that the non-delegable duties we intend to have performed only by the agency head in the event of a vacancy . . . are only those expressly vested by law or regulation exclusively in the vacant position. In this regard, we acknowledge and appreciate the Majority's statement that 'all the normal functions of government thus could still be performed.'"). Appellants do not argue that any statute vests exclusive authority with the Secretary or the AS–IA, and we are unaware of any such statute. We must therefore determine whether the Department itself has cabined this authority.

Relying on the text of Section 151.12, Appellants argue that the Department has restricted final decision-making authority to the Secretary or to the AS–IA. Appellants contend that because Section 151.12(c) provides that final decisions can be made by the AS–IA "pursuant to delegated authority," while Section 151.12(d) sets out the procedures for non-final decisions made by BIA officials, the Department has made

---

remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

final decision-making authority an exclusive function. We disagree. While Section 151.12 certainly contemplates that the actions of the Secretary and the AS–IA will constitute final agency action, when fairly read, it does not foreclose redelegation of these duties.

To begin, we hold that, contrary to Appellants' assertions, the presumption in favor of redelegability applies to regulations. We have previously recognized that "[w]hen a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer . . . is presumptively permissible absent affirmative evidence of a contrary congressional intent." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004); *see also Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1190 (10th Cir. 2014) ("[C]ircuits that have spoken on this issue are unanimous in permitting subdelegations to subordinates, even where the enabling statute is silent, so long as the enabling statute and its legislative history do not indicate a prohibition on subdelegation."). And while we have never held that this presumption applies to regulations, we conclude that it does so today. Indeed, the presumption in favor of redelegability may be more appropriate for regulations than it is for statutes because an agency has many tools to quickly reverse an unintended redelegation. Should any lower-ranking official exceed his or her powers and attempt to exercise an exclusive function or duty pursuant to a redelegation, the Secretary or the Deputy Secretary could simply invalidate any action taken pursuant to the claimed authority. In contrast, as a practical matter it is harder for Congress to claw back any function or duty that a lower-ranking official exercises contrary to Congress's intent to reserve it for the Secretary. And while an agency could amend its regulations to change which functions or duties are exclusive, Congress ensured that an agency cannot suddenly render an exclusive function or duty non-exclusive by requiring the regulation to be in effect during the 180 days

preceding any vacancy. 5 U.S.C. § 3348(a)(2)(B)(ii). An agency thus cannot amend its regulations to render an exclusive function non-exclusive as an end-run around the restrictions Congress set for acting officers in the FVRA. Given these considerations, we hold that the presumption in favor of redelegability applies to regulations.

With this presumption in mind, we turn to the text. As with statutes, regulations must be construed holistically. *See Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 356 n.10 (D.C. Cir. 1993); *see also Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) ("[I]n expounding a statute, we must not be guided by a single sentence . . . but look to the provisions of the whole law." (quoting *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 895 F.3d 90, 97 (D.C. Cir. 2018))). Here, the regulatory text provides two methods by which the Department can acquire land in trust. Section 151.12(d) contemplates that the decision to take land into trust may be delegated to a BIA official, but the BIA official's decision would be subject to administrative review. 25 C.F.R. § 151.12(d). Alternatively, the Department may acquire the land in trust through "[a] decision made by the Secretary, or the [AS–IA] pursuant to delegated authority," which "is a final agency action" and not subject to the administrative review process. *Id.* § 151.12(c). But the regulation also defines "Secretary" to include any "authorized representative." *Id.* § 151.2(a). Because of this inclusive definition, we conclude that the regulation's text, when fairly read, contemplates redelegation of the Section 151.12(c) authority by the Secretary.

The Department's other regulations confirm our reading of Section 151.12. As other regulations make clear, the Department knows how to use language that renders a function or duty exclusive to a particular official. *See, e.g.*, 25 C.F.R. § 33.3 ("The administrative and programmatic authorities of the

Assistant Secretary–Indian Affairs pertaining to Indian education functions shall not be delegated to other than the Director, Office of Indian Education Programs."); *id.* § 262.5(a) ("Area Directors may delegate this authority to Agency Superintendents, but only . . . to those who have adequate professional support available."); 43 C.F.R. § 20.202(b)(1) ("Each Ethics Counselor shall . . . [o]rder disciplinary or remedial action . . . . This authority may not be redelegated."). But in promulgating Section 151.12, the Department refrained from using any similar language. Appellants argue that the Department shut the door on redelegation in providing that the AS–IA will act "pursuant to delegated authority." 25 C.F.R. § 151.12(c). But this language pales in comparison to the language the Department typically uses to bar redelegation. The Department's decision not to use such prohibitory language thus supports our conclusion that a fair reading of the regulation permits redelegation beyond the AS–IA.

Appellants invoke the *expressio unius* canon to argue that the regulation's explicit mention of the AS–IA forecloses redelegation beyond the AS–IA. But as we have made clear, the *expressio unius* canon "is often misused" because drafters include duplicative language to ensure "that the mentioned item is covered—without meaning to exclude the unmentioned ones." *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998). Moreover, as the Second Circuit has recognized, the *expressio unius* canon carries even less weight in the redelegation context, where the statute or regulation "may mention a specific official only to make it clear that this official has a particular power rather than to exclude delegation to other officials." *United States v. Mango*, 199 F.3d 85, 90 (2d Cir. 1999). Section 151.12(c) is emblematic of the shortcomings of the *expressio unius* canon in the redelegation context. Although the regulation explicitly mentions the AS–IA, it incorporates the definition of

"Secretary" from Section 151.2(a) which includes any "authorized representative." Nothing else in the regulation's text suggests that the Department intended to limit the redelegation to the AS–IA, and invoking the *expressio unius* canon would require us to ignore the regulation's definition of "Secretary." Instead, we believe it a fairer reading of the regulation that the Department was merely making clear that the AS–IA had been delegated the authority of final decision-making, not that the AS–IA alone could exercise this authority. We therefore decline to apply the *expressio unius* canon to Section 151.12.

Section 151.12's purpose also supports our reading of the regulation. As with statutes, we may look to the purpose and drafting history of the regulation to confirm whether our interpretation of the text comports with the Department's intent in promulgating Section 151.12. *See U.S. Telecom Ass'n*, 359 F.3d at 565; *Giordano*, 416 U.S. at 514. Here, the Department's goal in amending Section 151.12 affirms our understanding that the Department did not intend to prohibit redelegation of this function. Section 151.12 was amended in 2013 to "[p]rovide clarification and transparency to the process for issuing decisions by the Department, whether the decision is made by the Secretary, [AS–IA], or a [BIA] official." *Land Acquisitions: Appeals of Land Acquisition Decisions*, 78 Fed. Reg. 67,928, 67,929 (Nov. 13, 2013). The Department was not focused on who could wield the authority to make final decisions. Rather, the Department sought to clarify whether an acquisition of land was final and what means of review were available to aggrieved parties: The decisions of the Secretary and AS–IA are final and appealable, it explained, and the decisions of BIA officials are not. In adopting that rule of finality, the Department said nothing of the authority of other Department officials, such as the Deputy AS–IA, to act. And in any event, finality is a benefit as well as a limitation. Instead of being required to proceed through the administrative appeals

process, a decision made under Section 151.12(c) permits aggrieved parties to immediately seek judicial review before an Article III court.[3] The Department's purpose in promulgating Section 151.12 thus confirms that the Department did not seek to foreclose redelegation of final decisions to acquire land into trust.

Appellants' reliance on *Giordano* is misplaced. There, the Supreme Court interpreted a statute where Congress provided that "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General" could authorize a wiretap, *Giordano*, 416 U.S. at 513 (quoting 18 U.S.C. § 2516(1)), but the challenged decision was made by the Attorney General's Executive Assistant. *Id.* Although the Court concluded that the statute's text, when "fairly read, was intended to limit the power to authorize wiretap applications," *id.* at 514, it reached this conclusion after contrasting the narrow delegation of Section 2516(1) with 28 U.S.C. § 510, which granted the Attorney General broad authority to delegate his power. Thus, because the statute in question used narrower language than the broader delegation, the Court determined that the Attorney General was restricted in his ability to delegate his wiretapping authority. In the present case, however, other regulations show that when the Department intends to render a function or duty exclusive, it says so clearly. And unlike the statute at issue in *Giordano*, *see id.* at 514–21, the history of Section 151.12 does not evince an intent by the drafters to restrict who could wield final decision-making

---

[3] It is also noteworthy that the Department has maintained its position that this function is redelegable over three presidential administrations. Appellants stress the breakneck speed that the Obama administration undertook to finalize the acquisition, but over four years later, two administrations never wavered from the position that this authority is redelegable.

authority, 78 Fed. Reg. at 67,929. We therefore hold that Section 151.12 permits redelegation beyond the AS–IA.

**B.**

We next turn to Appellants' argument that the Department failed to properly redelegate the final decision-making authority to Principal Deputy Roberts. Appellants contend that because the Department did not adhere to the redelegation procedures set forth in the Departmental Manual, the redelegation—either through automatic redelegation or through the Connor Memorandum—was impermissible. We reject Appellants' challenge.

Even if violation of the Departmental Manual supported a third-party claim—which we doubt, *see Schweiker v. Hansen*, 450 U.S. 785, 789–90 (1981); *Chiron Corp. & PerSeptive Biosystems, Inc. v. NTSB*, 198 F.3d 935, 944 (D.C. Cir. 1999)—Appellants' challenge still fails on its merits. Principal Deputy Roberts began serving as the Acting AS–IA in January 2016. After his term as AS–IA lapsed pursuant to the FVRA, Roberts reverted to his position as Principal Deputy. But under the Departmental Manual, the Principal Deputy "may exercise the [non-exclusive] authority delegated" to the AS–IA "[i]n the [AS–IA's] absence." 209 DM 8.4A. Appellants attempt to distinguish an "absence" from a "vacancy," but they forfeited this argument by failing to raise it in the District Court. *See Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 483 (D.C. Cir. 2016) ("To preserve an argument on appeal a party must raise it both in district court and before us."). Regardless, for purposes of delegation under this regulation, a vacancy may be treated as a type of absence. Appellants' reliance on other provisions of the Departmental Manual where the Department uses the term "vacancy" is misplaced, as those provisions deal specifically with succession, not redelegation. *See* 302 DM 1.1. As discussed above, final decision-making authority pursuant to Section 151.12 is a non-exclusive function, so this

is not an issue of a succession, but rather an issue of redelegation. Thus, "absence" can certainly include a "vacancy" in office, particularly when the functions at issue are non-exclusive. Therefore, the Department did not violate any of the provisions by automatically redelegating the AS–IA's non-exclusive functions and duties to the Principal Deputy.

In any event, any failure to automatically redelegate this non-exclusive function was corrected when the Department issued the Connor Memorandum. The Departmental Manual acknowledges that it can be superseded by any "appropriate authority," including but expressly not limited to "a Secretary's order." J.A. 248 (listing permissible appropriate authority, "e.g., a change in statute, regulation, or Executive order; a Secretary's Order or a court decision; *etc.*" (emphasis added)). As the Connor Memorandum explained, the Department intended for Principal Deputy Roberts to exercise the nonexclusive functions and duties of the AS–IA, but the succession order incorrectly identified Roberts's position. So, although "[t]he Department typically uses succession orders to delegate authority," the Department issued the Connor Memorandum to "confirm [Roberts's] authority to exercise the functions and duties of the AS–IA that are not required by law or regulation to be performed only by the AS–IA." J.A. 276. And given that the Departmental Manual permits deviation from the procedures by any appropriate authority, the Connor Memorandum, issued by the Deputy Secretary of the Interior, permissibly redelegated final decision-making authority to Roberts.[4] Thus, to the extent that the delegation was not

---

[4] Appellants also secondarily argue that Deputy Secretary Connor was not properly delegated the authority to redelegate final decision-making authority to Principal Deputy Roberts. But Appellants forfeited this argument by failing to raise it before the District Court. *Weinstein*, 831 F.3d at 483.

automatically made, it was correctly done through the Connor Memorandum.

## III.

Appellants also appeal the District Court's grant of summary judgment to the Department on Appellants' Rancheria Act claim. Appellants claim that they do not challenge the court-approved settlement agreement that reestablished federal recognition of Wilton. Instead, Appellants argue that because the Department distributed assets to Wilton members pursuant to the Rancheria Act, Wilton members are no longer entitled to the federal government's services on account of their status as Indians. We reject this argument as specious.

As Appellants are well aware, we have previously recognized that a court-approved settlement can invalidate the effect of the Rancheria Act. In another lawsuit brought by Stand Up, we concluded that a court-approved settlement agreement is sufficient to restore recognition of a tribe *and* to restore Indian status for members of that tribe notwithstanding the Rancheria Act. *Stand Up!*, 879 F.3d at 1184. The settlement agreement, which a federal court approved, stated that Wilton "was not lawfully terminated, and the Rancheria's assets were not distributed, in accordance with the" Rancheria Act. J.A. 901. The court made clear that the Rancheria Act did not apply to Wilton because the Tribe's assets were not distributed pursuant to the law. Pursuant to this agreement, the Department published notice in the Federal Register stating that Wilton and its members were "relieved from the application of section 10(b) of" the Rancheria Act. *Restoration of Wilton Rancheria*, 74 Fed. Reg. 33,468, 33,468 (July 13, 2009). It is therefore irrelevant that some Wilton members may have received assets because those assets were not distributed pursuant to the statute. The Rancheria Act has no force on the Department with regards to the Wilton Rancheria.

18

As a fallback, Appellants contend that the District Court erred by relying on the Federally Recognized Indian Tribe List Act of 1994 ("List Act"). Pub. L. No. 103–454, 108 Stat. 4791, 4792 (Nov. 2, 1994). Appellants argue that the List Act did not authorize the restoration of congressionally-terminated tribes through court-approved settlements in its substantive provisions, so the Rancheria Act still controls. Appellants are mistaken. While it is true that the District Court relied on the "Findings" section of the List Act, the "Findings" section acknowledges that "Indian tribes presently may be recognized . . . by a decision of a United States court." *Id.* § 103(3). This finding comports with decades of court-approved settlements reestablishing federal recognition of Indian tribes. *See, e.g.*, *Hardwick v. United States*, No. C-79-1710-SW (N.D. Cal. 1979); *Table Bluff Band of Indians v. Andrus*, 532 F. Supp. 255, 258, 259–61, 265 (N.D. Cal. 1981); *Smith v. United States*, 515 F. Supp. 56, 61–62 (N.D. Cal. 1978); *Duncan v. Andrus*, 517 F. Supp. 1, 5–6 (N.D. Cal. 1977); *see also Stand Up!*, 879 F.3d at 1185 (discussing validity of the *Hardwick* settlement). It is therefore irrelevant that the List Act failed to expressly authorize the recognition of tribes through court decisions because it confirmed that courts could do so. And that is precisely what the court did when it approved the settlement agreement. Therefore, the court-approved settlement agreement recognizing Wilton and invalidating the Rancheria Act's application to Wilton comports with the List Act.

Because a court-approved settlement agreement reversed the termination of the Wilton Rancheria pursuant to the Rancheria Act, we affirm the District Court's grant of summary judgment to the Department.

## IV.

Finally, Appellants challenge the District Court's grant of summary judgment to the Department on their NEPA claims. Appellants argue that, at a minimum, the Department should

have prepared either a supplemental EIS or a new EIS after it selected the Elk Grove location as the site for the casino. This contention also has no merit.

Congress enacted NEPA in 1970. 42 U.S.C. §§ 4321–4347. When an agency takes a "major Federal action[]," NEPA requires the responsible official to prepare a "detailed statement . . . on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided . . . , (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses . . . and . . . long-term productivity, and (v) any irreversible and irretrievable commitments of resources." 42 U.S.C. § 4332(C). This "detailed statement" has become known as an EIS.

An EIS goes through two stages: the draft EIS and the final EIS. 40 C.F.R. § 1502.9. *Id.* The principal agency— here, the Department of the Interior— prepares the draft EIS in conjunction with cooperating agencies and obtain comments regarding the proposed federal action. 40 C.F.R. § 1502.9(a). In the draft EIS, the principal agency must "[i]dentify the agency's preferred alternative . . . , if one or more exists." 40 C.F.R. § 1502.14(e). The final EIS must address all comments and discuss responsive opposing views it did not discuss adequately in the draft statement. 40 C.F.R. § 1502.9(b); *id.* § 1503.4(a). In responding to comments in the final EIS, the agency is permitted to (1) "[m]odify alternatives including the proposed action," (2) "[d]evelop and evaluate alternatives not previously given serious consideration," (3) modify or supplement its analyses, (4) make factual corrections, or (5) explain why the comments do not merit further agency response. 40 C.F.R. § 1503.4(a)(1)–(4). The agency must also identify preferred alternatives in the final EIS unless prohibited by law. 40 C.F.R. § 1502.14(e).

Where necessary, an agency must also prepare a supplemental EIS. An agency must prepare a supplemental

EIS if (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i)–(ii). An agency may also prepare a supplemental EIS if it determines that doing so would further NEPA's purpose. 40 C.F.R. § 1502.9(c)(2).

When we review an EIS prepared under NEPA, our "role is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.'" *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quoting *Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 97–98 (1983)). We must "ensure that the agency took a 'hard look' at the environmental consequences of its decision to go forward with the project." *Id.* (quoting *City of Olmsted Falls v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002)). In determining whether an agency is required to supplement its EIS, we also apply the arbitrary-and-capricious standard. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989).

In *Marsh v. Oregon Natural Resources Council*, the Supreme Court evaluated whether NEPA required an agency to prepare a supplemental EIS after finalizing the EIS. 490 U.S. 360 (1989). The Court concluded that, "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance." *Id.* at 374. If the federal action is pending, then the new information that comes to light must be "sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered" to require a supplemental EIS. *Id.* (internal alteration and quotation omitted). Put simply, courts must apply the rule of reason, which "turns on the value of the new

information to the still pending decisionmaking process." *Id.* at 374. In turn, we have held that "[t]he overarching question is whether an EIS's deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017) (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017)).

Under this standard, we conclude that the Department was not required to prepare a supplemental or a new EIS when it selected the Elk Grove location. As we have time and again made clear, "a [supplemental EIS] must be prepared only where new information 'provides a *seriously* different picture of the environmental landscape.'" *Friends of Capital Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (quoting *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004)). The Department's identification in the final EIS of a preferred action among the alternatives it had assessed did not result in a serious change in the environmental landscape. Nor does the fact that the Department buttressed its analysis in the final EIS help Stand Up's argument. To support its argument that new information affecting the environmental analysis came to light, Stand Up points to the hundreds of pages of analysis that the Department included in the appendix of the final EIS, but Stand Up fails to point to anything in these pages that suggests a significant development, thereby requiring supplementation.

Moreover, nothing prohibited the Department from buttressing its analysis between the draft EIS and the final EIS. In the final EIS, the agency must "respond to comments" and "discuss . . . any responsible view which was not adequately addressed in the draft" EIS. 40 C.F.R. § 1502.9(b); *see also id.* § 1503.4(a) (permitting the agency to respond to comments by "[m]odify[ing] alternatives including the proposed action" and "[s]upplement[ing], improv[ing], or modify[ing] its analyses"

in the final EIS).  But this requirement does not, as Stand Up suggests, prohibit the Department from buttressing its initial analysis.  And the Seventh Circuit's holding in *Habitat Education Center* does not contradict this proposition.  As Stand Up acknowledges, the Seventh Circuit concluded that when "[s]trictly construed," NEPA regulations "*permit* an agency to issue a final EIS that does no more than incorporate a previously issued draft EIS and respond to comments received." *Habitat Educ. Ctr., Inc. v. U.S. Forest Servs.*, 673 F.3d 518, 527 (7th Cir. 2012) (emphasis added).  That does not mean that an agency is prohibited from going further and bolstering its analysis in the final EIS.  The agency must only be sure that the new analysis is not based on new information that paints "a seriously different picture" of the impact of the project.[5]

Nor did the Department's decision to select the Elk Grove location fail to properly notify the public of its plans.  "Publication of an EIS, both in draft and final form, also serves a larger informational role" and "provides a springboard for public comment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  As such, we must review "whether an EIS's deficiencies are significant enough to undermine informed public comment and informed decisionmaking." *Mayo*, 875 F.3d at 20 (quoting *Sierra Club*, 867 F.3d at 1368).  But the designation of the Elk Grove site as the preferred alternative did not deprive the public and interested parties of the opportunity to meaningfully comment on or evaluate the proposal.  First, the Department listed the

---

[5] And this determination is subject to considerable judicial deference. *See Friends of Capital Crescent Trail*, 877 F.3d at 1059 ("If an agency's decision not to prepare a [supplemental EIS] turns on a 'factual dispute the resolution of which implicated substantial agency expertise,' the court defers to the agency's judgment." (quoting *Marsh*, 490 U.S. at 376)).

Elk Grove site as an alternative proposal. J.A. 968, 970. Second, the Department extensively analyzed the Elk Grove site in its draft EIS. J.A. 1191, 1271–1275, 1279–1324, 1329–1338. The Department also published the draft EIS online and made it available in the Galt public library, which is only a few miles away from Elk Grove. J.A. 969. Third, the Department's inclusion of the Elk Grove site triggered public comment, including by Stand Up and Lynn Wheat, two of the plaintiffs in this litigation. Thus, not only did the Department provide enough information in its draft EIS to allow for public comment on the Elk Grove site, but it actually did lead to public participation, including by Appellants. Therefore, the Department satisfied its public notice requirements and was not required to prepare a supplemental or a new EIS.

Appellants' remaining arguments are similarly without merit. First, Appellants argue that the Department failed to follow NEPA regulations because it only made the City of Elk Grove a cooperating agency later in the process. But as the regulation that Appellants cite makes clear, the lead agency must only request "the participation of each cooperating agency in the NEPA process *at the earliest possible time*." 40 C.F.R. § 1501.6 (emphasis added). Moreover, an agency could "request the lead agency to designate it a cooperating agency," *id.*, which is what the City of Elk Grove did, and the Department granted that request. It was thus not error for the Department to fail to promptly include the City of Elk Grove as a cooperating agency.

Second, Appellants argue that the turnaround time between the close of the final EIS's comment period and the issuance of the ROD is impermissibly short. Admittedly, the two-day turnaround between the closure of the comment period and the issuance of the ROD is not typical. But Appellants offer no controlling precedent suggesting that the quick turnaround was *per se* impermissible. And as the District Court

recognized, the one case Appellants cite—a district court case from North Carolina—is inapposite. There, the agency acknowledged that it failed to respond to numerous comments and had already reopened the NEPA process. *North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 676 (M.D.N.C 2001). Here, however, Appellants have not claimed that the Department failed to respond to any comments. Thus, while it may have been unusual for the Department to have moved so quickly to issue the ROD, that short turnaround in and of itself is insufficient to invalidate the decision.

## V.

Over seven years after the Department began the process of acquiring land in trust on behalf of Wilton, it has maintained its position that Wilton is a federally recognized tribe and that the officials who made the decision properly followed the Department's regulations. In acquiring this land in trust, the Department followed all of its statutory and regulatory obligations to consider the environmental impact of this acquisition. We therefore affirm.

*So ordered.*